YOUNG AMERICA, The (SCOTT v.). See Case Nos. 12,549 and 12,550.

YOUNGER v. GLOUCESTER MARINE INS. CO. See Case No. 5,487.

YOUNG MEN'S ASS'N (KING v.). See Case No. 7,811.

---

## Case No. 18,180.

### The YOUNG MECHANIC.

[2 Curt. 404.][1]

Circuit Court, D. Maine. Sept. Term, 1855.[2]

MARITIME LIEN — DOMESTIC VESSELS — LIEN FOR MATERIALS—INSOLVENCY AND DEATH OF OWNER—EFFECT.

1. A maritime lien is a jus in re, constituting an incumbrance on the property, and existing independent of the process used to execute it. It is not divested by the death of the owner of the vessel, and the representation, by his administrator, of the insolvency of his estate.

[Cited in The Larch, Case No. 8,085; Vandewater v. Mills, 19 How. (60 U. S.) 90; Pendergast v. The Kalorama, 10 Wall. (77 U. S.) 212; Francis v. The Harrison, Case No. 5,058, note; The Kate Tremaine, Id. 7,622; Merchants' Mut. Ins. Co. v. Baring, 20 Wall. (87 U. S.) 163; The Columbus, Case No. 3,044; The E. A. Barnard, 2 Fed. 722; The J. W. Tucker, 20 Fed. 130; The Cumberland, 30 Fed. 450; The Scotia, 35 Fed. 909; Bailey v. Sundberg, 1 C. C. A. 389, 49 Fed. 584; The Samuel Marshall, 4 C. C. A. 391, 54 Fed. 401, 402; The Alvira, 63 Fed. 149; The J. E. Rumbell, 148 U. S. 10, 13 Sup. Ct. 499; Moran v. Sturges, 154 U. S. 256, 14 Sup. Ct. 1027; The Avon, Case No. 680.]
[Cited in Briggs v. A Light Boat, 7 Allen (Mass.) 296; Atlantic Works v. The Glide, 157 Mass. 528, 33 N. E. 164.]

2. The statute of Maine conferred on mechanics and material-men, such a lien on domestic vessels, as the general admiralty law had previously allowed to them on foreign vessels.

[Cited in The Kate Tremaine, Case No. 7,622; The Richard Busteed, Id. 11,764; The Mary Gratwick, Id. 17,591; The Columbus, Id. 3,044; Topfer v. The Mary Zephyr, 2 Fed. 826; The Cumberland, 30 Fed. 450; The Samuel Marshall, 49 Fed. 759; The Julia, 57 Fed. 235; Lighters Nos. 27 and 28, 6 C. C. A. 495, 57 Fed. 666; The Templar, 59 Fed. 206; The Alvira, 63 Fed. 149.]
[Cited in Perkins v. Pike, 42 Me. 149.]

This was an appeal from a decree of the district court in a suit in rem, to enforce payment of a claim for materials supplied by the libellant for building a vessel within the district of Maine. The decree was in favor of the libellant [Case No. 18,181], and the claimant appealed. It appeared that the person who was building the ship, upon a contract with whom the materials were supplied, had died before the institution of the suit, and his administrator had represented his estate to be insolvent, according to the local laws of the state. The only question made on the appeal was, whether the lien conferred by the local law, still subsisted and could be enforced in the admiralty, notwithstanding such death and representation of insolvency.

Mr. Shepley, for appellant.
Mr. Evans, contra.

CURTIS, Circuit Justice. This being a domestic vessel, the lien, if any, is conferred by the local law. If by that law it exists, it may be enforced in the admiralty. If it has ceased to exist, it can be enforced nowhere. The General Smith, 4 Wheat. [17 U. S.] 438; Peyroux v. Howard, 7 Pet. [32 U. S.] 324. The Revised Statutes of Maine (chapter 125, § 35) give to those who perform labor, or furnish materials for or on account of any vessel building or undergoing repairs, "a lien on such vessel for his wages or materials." To decide the question now before me, it is necessary to determine what this statute intends to confer, on the laborer or material-man. Its terms must be construed with reference to its subject-matter; and, prima facie, the word "lien," here used, should bear the same signification which had been attached to it in the maritime law. Under that law, mechanics and material-men have a lien on foreign vessels for the price of their labor and materials; but not on domestic vessels. This statute grants them a lien on domestic vessels. It does not define the term "lien," nor in any manner describe the sense in which it was intended to be employed. Sound rules of construction require me to say, it was intended to be employed in the same sense in which it had been previously known and used; and that the right or interest which it designates, is the same right or interest which laborers and material-men had previously possessed in foreign vessels. Using a legal term, and applying it, to give to laborers and material-men some right in the

---

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]
[2] [Affirming Case No. 18,181.]

vessels, for or on account of which their labor or materials are furnished, the presumption is, that this term was used in its known legal sense. This presumption may be removed by other provisions of the statute. I shall consider hereafter whether it is so in this instance. But I will first inquire what right or interest is conferred by the statute, provided it intended to create such a lien, as exists by the general admiralty law upon foreign vessels.

Though the nature of admiralty liens has doubtless been long understood, it does not seem to have been described with fulness and precision, in England or this country. That it differs from what is called by the same name in the common law, is clear; for it exists independent of possession. The Bold Buccleugh, 22 Eng. Law & Eq. 62; The Nestor [Case No. 10,126]. That it is not identical with equitable liens, is equally clear; for the latter arise out of constructive trusts, and are neither a jus ad rem, or a jus in re; but simply a duty, binding on the conscience of the owner of the thing, and which a court of equity will compel him specifically to perform. 2 Story, Eq. Jur. § 1217; Ex parte Foster [Case No. 4,960]; Clarke v. Southwick [Id. 2,863].

It has been declared by very high authority, that what we term a "maritime lien," was derived by the maritime law from the civil law. In The General Smith, 4 Wheat. [17 U. S.] 443, Mr. Justice Story, delivering the opinion of the supreme court, and speaking of the lien of a material-man, says: "The general admiralty law, following the civil law, gives the party a lien on the ship for his security." And in The Nestor [supra], he expresses an opinion that the general maritime law was in this particular, drawn from the texts of the Roman law, with some modifications, to which he refers. In delivering the judgment of the court of appeal in the case of The Bold Buccleugh, above cited, Sir John Jervis also declares, in terms, that the rule as to the persistency of a maritime lien, is deduced from the civil law. And the same law is declared by Mr. Abbott to be the source of maritime liens, of material-men. Abb. Shipp. 143. But the right conferred by the Roman law upon those who lent money to build, or repair a vessel, was merely a personal privilege, to be paid in preference to general creditors. Poth. Pan. 20, 24, 26, note. Emerigon (Traité des Con. a la Grosse, c. 12, § 1) observes, that Kuricke has maintained that, such creditors had an absolute privilege and a legal hypothecation, by the Roman law; but that perhaps he had no other design than to adapt the texts he cites to modern usages. In a similar way, they are probably to be understood, who speak of the deduction of this right from the civil law. Not that any texts of the Roman law can be produced which confer upon those who now possess it, what we call a maritime lien, but that the commercial

usages of the middle ages modified some of the rules of that law respecting hypothecations, and adapted them to the wants of commerce.

The texts of the Roman law on this subject, were doubtless used, and with some modifications afforded the rules which obtained in the maritime laws of Europe during the middle ages. The laws "Qui in navem extruendam, vel instruendam, credidit, vel etiam eruendam, privilegium habet" (D. 42, 5, 26); and "Quod quis navis fabricandæ, vel emendæ, vel armandæ, vel instruendæ causa, vel quoquo modo crediderit, vel ob navem venditam petat, habet privilegium post fiscum" (D. 42, 5, 34); and "Interdum posterior potior est priori. Ut puta: Si in rem ipsam conservandam impensum est, quod sequens credidit; veluti si navis fuit obligata, et ad armandam eam (rem) vel reficiendam ego credidero" (D. 20, 4, 5),—were probably then understood as conferring, not merely a personal privilege, to be paid in preference to other creditors on a sale of the debtor's goods, but as importing an actual hypothecation tacitly made by the law. Pothier, in his note to the law last cited (20, 4, 4), says the correct opinion is, that these laws do not create tacit hypothecations, as they were thought to do by Accorsius and some of the ancient commentators. Pardessus, in his note to the last cited law (1 Col. des Lois Mar. p. 113) and to the law de exercitoria (Id. p. 98, note 4), mentions the same difference between the received interpretation and that of the older writers. The suggestion of Emerigon respecting Kuricke, already quoted, may be applicable, in some measure, to all these old commentators; but whether the texts of the Roman law were misunderstood, and so were the sources of the existing usages, or whether it was only intended to adapt them to those usages which had already obtained, it is certain that in the general maritime law of Europe privileged hypothecations were tacitly conferred in the cases in which, what we term liens, now exist. It is true we do not find their precise nature described in any of the ancient collections of sea laws, so far as I have discovered. These laws were, generally, simple practical rules, often partaking of the rudeness of the ages in which they were compiled, dealing, rarely, with abstractions, containing few definitions, and, with the exception of the customs and ordinances of Catalonia and Arragon, collected by Pardessus in volume 5, p. 333, &c., they are not laws of procedure. In the Consulat de la Mer, the most ancient and important of all, there is no definition of a maritime lien, nor any account of the way in which it was to be worked out. Its usual formula is, simply, the ship ought to be sold, and the debt or damage paid from its price. And so when the personal liability of the master is ordained, it is only said, he ought to be put into the power of the magistrate. See chapter

289. But that the right or privilege of the seaman in the ship as a security for his wages (chapters 138, 193), of the merchant for injury or loss of his goods, &c. (chapters 59, 63, 106, 227, 254, 259), or for the price of his goods sold to raise money for the necessities of the ship (chapter 107), was a real right, a jus in re in contradistinction to a mere personal privilege to be paid in a concourse of creditors, I have no doubt. In the Laws of Wisbuy this is clearly shown. Emerigon (Con. a la Grosse, c. 12, § 4) and Boulay Paty (1 Cours de Droit Com. p. 38), translate the forty-fifth article of these laws respecting the right of a merchant whose goods have been sold to supply the necessities of the vessel, or who has lent money for the same purpose, "auront special hypothèque et suit le navire." See, also, 1 Pard. Col. des Lois Mar. 492, art. 43. Le Guidon (chapter 19, arts. 1, 2; Pardessus's Col. des Lois Mar. 424) denominates such a right "special hypothèque."

According to the modern civil law of the continent of Europe, movables cannot be hypothecated, and as vessels are movables, to term the privileges created by the maritime law, hypothecations, would introduce a seeming anomaly. Dom. Civ. Law, bk. 3, tit. 1, § 1, note 1655, &c.; Kaufman, Mackeld. Civ. Law, bk. 1, c. 6; 1 Boul. P. Dr. Com. p. 35; Emerig. Con. a la Grosse, c. 12, § 2. For this reason the French ordinance of 1681, after deciding (article 1) that vessels are movables, in article 2, instead of the term "hypothèque," uses the words "affecté aux dettes." Boulay Paty, in his elaborate dissertation on the maritime privileges of the French law, though he distinguishes between "affectés" and "hypotheques," points out no practical difference between them, save that the latter are paid in the order of their dates, while the former are paid according to their causes. And he describes the right of a lender on bottomry, as "privilege sur les choses affectés au pret," as does Pothier also. 1 Boul. P. Dr. Com. pp. 36, 328; Poth. Pret a la Grosse, note 9. There is no doubt that the maritime law of France at this day, following the long existing usages of the commercial world, tacitly creates what we term "liens," but what are called in their law "privileges;" which are, in effect, tacit hypothecations of the vessel. Domat, Civil Law (Cushing's Ed., note 1765, bk. 3, tit. 1, § 5), says: "All privileges make a particular appropriation, which gives to the creditor the thing for his pledge." Merlin (Rep. voc. "Privilege de Creance") a "privilege," properly speaking, is a privileged hypothecation, distinguished by the name of "privilege" on account of the different causes from which they spring. See, also, Pard. Droit Commer. Pat. 5, tit. 1, c. 6, note 1190; and Toulier, liv. 3, tit. 3, c. 5, note 98. Emerigon, after giving the texts of the Roman law, already cited, says: "We have adapted to our own

usages the texts just cited, as will be presently seen. The personal privilege of which the Roman law speaks is unknown in our jurisprudence. Every privilege imports, per se, a tacit and privileged hypothecation upon the thing which is the subject of it." In the law of Scotland such a right is termed "hypothec," and is, professedly, what was known to the Roman law as "hypotheca." Ersk. Prin. bk. 3, tit. 1, § 13.

In my opinion the definition given by Pothier of an hypothecation is an accurate description of a maritime lien under our law. "The right which a creditor has in a thing of another, which right consists in the power to cause that thing to be sold, in order to have the debt paid out of the price. This is a right in the thing, a jus in re." Traité de l'Hypothèque, art. prelim. See, also, Saund. Justinian, p. 227. It is not divested by a forfeiture for a breach of municipal law (St. Jago de Cuba, 9 Wheat. [22 U. S.] 409); nor by a sale to a bona fide purchaser without notice (The Chusan [Case No. 2,717]; The Bold Buccleugh, 3 W. Rob. Adm. 220; s. c. on appeal, 22 Eng. Law & Eq. 62). See, also, 1 Notes of Cas. 115; 4 Notes of Cas. 170; 6 Notes of Cas. 68. It is not merely a privilege to resort to a particular form of action to recover a debt. The maritime law, following the Roman, distinguished between actions and privileges, and held that actions do not make hypothecations. Emerigon, Con. a la Grosse, c. 12, § 1. It is an appropriation made by the law, of a particular thing, as security for a debt or claim; the law creating an incumbrance thereon, and vesting in the creditor, what we term a special property in the thing, which subsists from the moment when the debt or claim arises, and accompanies the thing even into the hands of a purchaser.

It is true, such a lien gives to the creditor no right to possess the thing; and it can be executed only by a suit in rem. But the same is true of an express hypothecation by a bottomry bond. Whether the creditor may himself seize and sell the thing or must obtain a condemnation, to be followed by a judicial sale, does not necessarily affect the question, whether he has a real right in the thing, jus in re. Under the Roman law he was allowed to sell, himself, even at private sale. Some regulations were made at a late day respecting notice. But the system was very inartificial. The modern civil law of Europe has better protected the rights of debtors and third persons. See Kaufman, Mackeld. Civ. Law, bk. 1, tit. 3. In France the creditor who had but a tacit hypothecation, without any judgment, could not seize and sell. He was obliged to institute judicial proceedings, and obtain a judicial sale. Pothier, De L'Hypothèque, c. 2, § 3. But the creditor could maintain a real action, to take the possession of the thing from a third person, actio hypothecaria, and have it con-

demned, to the satisfaction of his debt, actio mutui, or locatio conducti. See Kaufman, Mackeld. Civ. Law, 396, and note. An ordinary libel in rem to enforce a lien, includes both these actions of the Roman law, and at the same time recovers the possession and subjects the thing to the payment of the debt. Indeed Pothier's description of the execution of an hypothecation is as applicable to a proceeding in the admiralty to enforce a lien. "The execution of an hypothecation is made by the seizure which the creditor makes of the thing hypothecated and the judicial sale which is ordered thereof." Poth. De L'Hypothèque, c. 2, § 3. Whether he can make the seizure himself, only to be followed by a judicial sale, or must resort to a court for both, may be important as to remedy, but does not affect his ultimate and essential right. A right which enables a creditor to institute a suit, to take a thing from any one who may possess it, and subject it, by a sale, to the payment of his debt; which so inheres in the thing as to accompany it into whosoever hands it may pass by a sale; which is not divested by a forfeiture or mortgage, or other incumbrance created by the debtor, can only be a jus in re, in contradistinction to a jus ad rem; or in contradistinction to a mere personal right or privilege. Though tacitly created by the law, and to be executed only by the aid of a court of justice, and resulting in a judicial sale, it is as really a property in the thing as the right of a pledgee or the lien of a bailee for work. The distinction between a jus in re and a jus ad rem was familiar to lawyers of the middle ages, and is said then to have first come into practical use, as the basis of the division of rights into real and personal. Saund. Intro. to Just. p. 49. A "jus in re" is a right, or property in a thing, valid as against all mankind. A "jus ad rem" is a valid claim on one or more persons to do something, by force of which a jus in re will be acquired. Poth. Traité du Droit de Domaine, c. "Pretences"; Hugo, His. du Droit Rom. p. 118. The lawyers of the middle ages, who gave form to the customs of the seas, and arranged judicial proceedings to carry them into effect, certainly did not rank a lien or privilege among the jura ad rem. For it has been settled so long, that we know not its beginning, that a suit in the admiralty to enforce and execute a lien, is not an action against any particular person to compel him to do or forbear any thing; but a claim against all mankind; a suit in rem, asserting the claim of the libellant to the thing, as against all the world. It is a real action to enforce a real right. Just. L. 4. tit. 6, de actionibus, and Sanders' note, p. 527.

I have bestowed attention on the investigation of the nature of an admiralty lien, because it is essential to the decision of the case now before me. If such a lien be, as has been considered by learned judges, for whose opinions I have great respect, "only a privilege to arrest the vessel for the debt, which, of itself, constitutes no incumbrance on the vessel, and becomes such only by virtue of an actual attachment" (The Triumph [Case No. 14,182]), then it might be difficult to maintain that this statute lien, conferred by the local law, subsists after the statute insolvency of the estate of the decedent owner. But if, as I think, it is a real and vested interest in the thing, constituting an incumbrance placed thereon by operation of law, to be executed by a judicial process against the thing, to which no person is made a party, save by his voluntary intervention and claim, then the inability to maintain a suit against the administrator, and the incapacity to make any attachment of the property of the deceased in such a suit, though they may amount to infirmities in the remedy when pursued in the state courts, do not affect the right of the creditor, nor his remedy in the admiralty. Indeed, if a maritime lien be merely a privilege to attach the vessel for a debt, which becomes an incumbrance only in virtue of an actual attachment, it is difficult to see, how it amounts to any special privilege in the New England states, where every creditor has the privilege of attaching all vessels for all debts, which become incumbrances by virtue of such attachments. Incumbrances created merely by attachments, must take rank, in the absence of positive provisions of law to the contrary, according to the dates of such attachments. But incumbrances created by maritime liens are marshalled according to the causes from which such liens spring. That is, they subsist, and bind the property, not in virtue of the legal process used to enforce them, but by operation of the law which creates them and fixes them on the property, at the moment when the debts are incurred. How they are to be marshalled, and what is the effect of a proceeding instituted by one lien creditor upon the rights of others, is quite a different question, upon which it is not necessary here to express any opinion. See The Globe [Case No. 5,483]; The America [Id. 288]; The Ord. of Peter 4, in Pard. Col. 389, cc. 32–34; Emerigon, Con. a la Grosse, c. 12, § 3; The Saracen, 2 W. Rob. Adm. 451.

I consider the decision of the supreme court of Maine in Severance v. Hammatt, 28 Me. 511, shows only that there is an infirmity in the remedy under the local law. But the legislature must be taken to have known that the right conferred could be enforced in the admiralty where no such infirmity exists, and by the act of 1850 (chapter 159) they promptly supplied the defects in the proceedings of their own courts.

My opinion is, that the lien conferred by the local law was an existing incumbrance on the vessel, not divested or extinguished

by the death or insolvency of the owner; and that, consequently, the decree of the district court must be affirmed.

[The libels were referred to a commissioner to ascertain the amount of each claim, and, upon his report being confirmed by the court, the parties were heard on the taxation of costs. Case No. 18,182.]