THE KATE.

THE JOSHUA NICHOLSON.

THE CHILIAN.

THE FLORIDA.

BERWIND WHITE COAL CO. v. THE KATE. SAME v. THE JOSHUA NICHOLSON. SAME v. THE CHILIAN. SAME v. THE FLORIDA.[1]

(District Court, S. D. New York. May 27, 1893.)

1. MARITIME LIENS—SUPPLIES—CHARTERED VESSEL — LACK OF AUTHORITY TO BIND SHIP—KNOWLEDGE—FOREIGN VESSEL.

Where a material man, in furnishing coal to a vessel, has no dealings with any one who has any real or even apparent or implied authority to bind the ship for coal, but with the charterer only, whom he knows in effect to have no such authority, and there has never been any common agreement or understanding that he should have a lien, no lien arises under the maritime law, even upon a foreign ship.

2. LIENS UNDER STATE STATUTE — CHARTERED VESSEL — CHARTERER NOT AUTHORIZED TO BIND SHIP—KNOWLEDGE OF LACK OF AUTHORITY.

The New York state statute (Laws 1862, c. 482) giving a lien on a vessel for a debt contracted by the master, owner, charterer, etc., does not apply to a case where one furnishing supplies voluntarily dealt with the charterer alone, a domestic corporation, knowing, or being legally chargeable with knowledge, that such charterer had no authority to bind the ship for the supplies.

3. SAME—CONSTITUTIONAL LAW.

Semble, the state authority cannot impose such a lien contrary to known charter stipulations, as they would be an unreasonable burden upon and interference with commerce.

In Admiralty. Libels by the Berwind White Coal Company against the steamships Kate, Joshua Nicholson, Chilian, and Florida, for supplies of coal furnished. Libels dismissed.

Wilcox, Adams & Green, for libelant.

Convers & Kirlin, for the Kate, the Joshua Nicholson, and the Chilian.

Stimson & Williams, for the Florida.

BROWN, District Judge. The libelant claims to have liens for coal supplied to the above-named steamers in November, 1892, all under substantially the same circumstances. The steamers were of foreign registry, belonging to British subjects. During the 12 or 18 months prior to November, 1882, they had been chartered and run by the Brazil Mail Steamship Company, in addition to some five other large steamers, which had long been owned and run by that company in its regular line. The company was a New York corporation. In February, 1893, it became embarrassed, and failed to pay its bills. All the coal in question was supplied in New York city upon the order of the U. S. & Brazil Mail Steamship Company under an arrangement made between that company and the libelant in June, 1891, under which it was expected that the company would pay the bills within 60 days after the delivery of the coal.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

At that time the company was not running any chartered vessels, but its own only. The understanding as regards prompt payment was not carried out, and at times the indebtedness of the company to the libelant amounted to some $70,000. This was much reduced, however, at the time when the company suspended payment, in February, 1893.

In June, 1891, when the arrangement for the supply of coal was made, it was consented that the libelant should be at liberty to file its claim of lien against the company's vessels, and have any benefit that that course might give it, although in some of the correspondence the steamship company denied that the libelant would thereby acquire any lien. But this consent had no reference to chartered steamers, since no chartered steamers were at that time operated by the company, nor until several months afterwards. Accordingly, the libelant, after June, 1891, regularly filed specifications claiming a lien under the state law, according to its provisions, within 30 days after the delivery of the coal to the steamship company's vessels respectively. When afterwards the chartered steamers were employed, the libelant filed its claim of lien against the chartered steamers in the same manner as against those owned by the company.

The chartered steamers were all operated under what is known as "time charters," the provisions of which required that the charterers should pay for all coal, and certain other expenses of the voyage. The vice president of the libelant company, who attended to its business in New York, was daily accustomed to be present at the Maritime Exchange; and from the general information there acquired, as well as from the names of the chartered steamers, as contrasted with the peculiar names of the vessels owned by the Brazil line, he understood that these steamers were chartered upon time charters, requiring the Brazil Company to pay for the coal. The dealings were always with that company exclusively; never with the owners, nor with their agents in this city, nor with the masters of the steamers. The bills were rendered to the Brazil Mail Steamship Company only; and no notice either of the bills themselves, or of any claim to liens therefor upon the chartered vessels, was ever given to the master, the owner, or to the agents in this city, until after the company's failure. The company alone was expected to pay the bills; and the specifications of claim were filed in order to obtain the benefit of a lien, provided the state law gave any: and the only question is, whether, under such circumstances, there is any lien either under the maritime law, or under the statute of this state.

1. It seems to me clear that there is no lien in these cases under the maritime law. For in each case the dealings of the libelant were neither with the owner of the ships, nor with the master, nor with any of the officers of the ships; but solely with the Brazil Mail Steamship Company, who were virtually known to be charterers bound to supply the coal on their own responsibility, and who had contracted with the libelant accordingly. That company had absolutely no authority to bind the ship for coal; and the libelant in

effect knew it. The libelant had no dealings whatever with any one that had any real, or even any apparent, or implied authority to bind the ship, such as the master or the agent of the ship, but dealt with the charterers only, whom he knew in effect to have no such authority; and there was never any common agreement or understanding that the libelant should have a lien. Under such circumstances no lien arises under the maritime law, even upon a foreign ship. The Stroma, 3 C. C. A. 530, 53 Fed. Rep. 281; The Samuel Marshall, 49 Fed. Rep. 754, affirmed 54 Fed. Rep. 396; The Turgot, 11 Prob. Div. 21; The Aeronaut, 36 Fed. Rep. 497, and cases there cited.

2. A statutory lien is, however, claimed under the law of the state of New York, which gives a lien on the vessel upon a debt for supplies "contracted by the master, the owner, charterer, builder, or consignee, or by the agent of either of them within this state." Laws 1862, c. 482; Laws 1885, c. 273. This claim is made irrespective of the question whether the vessels should be treated as foreign or domestic, under the terms of the charters, whereby it is claimed that the charterers became owners pro hac vice.

The charters in these cases were of a somewhat mixed character. The fiction of regarding the charterers as owners pro hac vice, whether strictly applicable to these cases or not, does not seem to me to furnish any aid to the solution of the question here presented. For the difficulty with the libelant's case is that the libelant's representative voluntarily dealt with the charterers alone, whom he knew in effect to have no authority to bind the ship for coal; and the obligations of good faith, therefore, do not permit any lien in such a case. The state statute cannot be reasonably construed as designing to create what would virtually amount to a confiscation of the property of one man to pay the debt of another, not only without any express or implied authority of the former, but contrary to his express and known stipulation. Stephenson v. The Francis, 21 Fed. Rep. 715, 726. If that result was really intended by the state statute, the act would be unconstitutional and void in its application to commercial and maritime transactions, as an unreasonable and unjust interference with commerce, and as imposing an unjust burden on ships as the instruments of commerce, beyond the power of state authority. Henderson v. The Mayor, 92 U. S. 259, 273. And see Harman v. Chicago, 147 U. S. 396, 13 Sup. Ct. Rep. 306.

I have said that Mr. Berwind knew in effect that the steamship company had no authority to bind the chartered vessels for coal. This is necessarily to be inferred, not only from his knowledge of facts sufficient to put him upon inquiry, but because, notwithstanding his testimony that as to various particulars asked of him, he had no positive knowledge, yet he does nevertheless state explicitly that he understood these vessels to have been chartered by the steamship company on time charters, and that the charterers were to pay for the coal; and his manner in giving this testimony added much to the persuasive force of those explicit statements, and leaves no doubt that he virtually and in effect

knew that the company, and not the owners, were to supply the coal. He says:

"Answer. I understood they were chartered boats; they didn't run in their line of names like their boats.

"Question. Did you distinguish them by their names? A. They were different; they didn't seem to be like their own boats, any way; from their names; and I assumed they were chartered. * * * I don't know for whose interest they may order the coal; I can't tell that.

"Q. As matter of fact, of commercial dealing, don't you in fact understand that such vessels are under time charter? A. Yes, I may assume that; not from positive knowledge.

"Q. Of course you don't see the charter parties; but it is sort of in the air, on change, that those vessels are on time charters? A. Yes, sir.

"Q. When you furnish the coal to such vessels, when they are on time charters, instead of sending the bills to the owners, or to the agents of the owners, you send the bills to the persons who order the coal? A. Yes, sir; that is right. * * * I suppose there is a condition about the coal in it—a condition in a time charter, as to the supply of bunker coal.

"Q. You understand that by a time charter the time charterer is expected to furnish the coal? A. I don't know that. I thought that was a condition in the charter party between the owners and the charterer. * * *

"Q. Commercially don't you understand that to be the case? A. I assume that is the case; but not from knowledge. * * *

"Q. Isn't it a fact that in the first instance you expected the Brazil Mail Steamship Co. to pay for this coal, and that you simply filed those liens so as to protect yourself in case the Brazil Mail Steamship Co. didn't pay it? A. That is right."

It appeared that Mr. Berwind attended the Maritime Exchange almost daily, where information was received on such subjects, and further information was easily procurable; that he had chartered both sailing vessels and steamers, though he had not paid special attention to all the terms of the charters; that acting upon the assumption above stated, he had dealt with the steamship company exclusively, and had never dealt with the masters, and had never sought for the agents of these steamers in this city, who had at all times funds on owners' account more than sufficient to supply any coals for which on any voyage the ship could have been chargeable.

These vessels, moreover, were apparently foreign vessels. In not dealing with the master, but with third persons, apparently strangers to the ship, the libelant could not rely on any implied or presumptive power to bind the ship for coal such as the master possesses. Nor in any event could the libelant be entitled to treat these vessels as domestic vessels, except upon the assumption of a charter, whereby the steamship company became owner pro hac vice; and if the libelant would avail itself of that assumption, it must take the charter as a whole, and stand chargeable with knowledge of all its terms which inquiry would have disclosed, and among them that requiring the charterers to pay for the coal. There is little need, however, to resort to this implication in the present cases, since Mr. Berwind explicitly states that he assumed the facts to be as they actually were.

In the case of The Samuel Marshall, 49 Fed. Rep. 754, the vessel was exclusively in the hands of the charterers, by whom she was manned, equipped, and run. In that case, as in this, the supply

men sought the benefit of the state statute, though chargeable with knowledge, as in this case, that the charterers were bound to pay for the supplies and had no actual authority to charge the ship. Judge Severens, on a careful review of the whole subject, held the material men not entitled to any lien under the state statute; both because the credit was not actually given to the ship, and because the reasonable construction of the statute did not permit a lien under such circumstances. As to the credit, he observes that in that case the credit was given to the charterers "with the supposition that by force of the transaction the libelants would have a lien upon the vessel." Page 759: "This," he observes, "is quite a different thing from giving credit to the vessel." In the present case I could hardly find as a fact that the libelant even supposed that by filing these specifications it would actually acquire any valid lien. I think the evidence shows no more than that the specifications were filed for the mere chance of what they might be worth; while the long dealing of the libelant with these various chartered vessels, the large amounts which accrued and remained long in arrears from the steamship company, with no notice of claim or demand upon the owner of the vessels, or the master, or the agent of the vessels in this port, whom the least inquiry would have made known to the libelant, seem to me utterly irreconcilable with the slightest credit given in fact to the vessel, or the least supposition that the vessel or her owner was either credited, or thought liable for the bills.

As respects the lien accruing by the positive language of the state law, Judge Severens, in the case above, continues, (page 760:)

"It is a condition to the acquisition of a valid lien upon the property of another that it should be acquired in good faith, and with due respect to his rights. * * * If the merchant does furnish supplies on credit, in the face of an agreement between others of which he has notice, devolving the obligation of payment upon another than the owner, and denying to the charterer the right to hypothecate the ship, he ought not to be allowed to assert a lien upon the owner's property."

These general principles were, on appeal, affirmed in the court of appeals for the district of Ohio in a carefully considered opinion. The Samuel Marshall, 54 Fed. Rep. 396, 404. They are in accord with previous decisions in this district.

I do not think the use of the word "charterer" in the statute of this state can lead to any different result. The statute, in giving a lien for debts "contracted by the master, owner, charterer, builder, or consignee, or by the agent of either of them," refers to these classes of persons in a general way only. The statute does not supersede in the least the applications of those limitations or conditions which common equity and legal rules of construction must impose upon its general language in special circumstances where the authority to contract any charge against the ship or owner is taken away, and that fact is known to the dealer. If an "agent" or a "consignee" of the ship were to contract the debt without necessity and contrary to the express orders of the owner, known to the dealer, it would not be contended that the debt, though contracted by an "agent" or "consignee," would under such

circumstances become a valid lien. The statute presupposes for its application a relation of express or implied authority; and where this authority does not exist and that fact is known to the material man, or he is legally chargeable with the knowledge of it, no lien arises when the transaction is with the charterer, any more than when the dealing is with any other agent or consignee known to be unauthorized and forbidden to contract the debt.

The libels must be dismissed, with costs.