## THE ADVANCE.

## THE SEGURANCA.

## THE VIGILANCIA.

## THE ALLIANCA.

EMPIRE WAREHOUSE CO. v. THE ADVANCE. SAME v. THE SEGURANCA. SAME v. THE VIGILANCIA. SAME v. THE ALLIANCA.

(District Court, S. D. New York. March 27, 1894.)

1. MARITIME LIENS—WHARFAGE—DOMESTIC VESSELS.

A maritime lien arises for wharfage furnished to domestic vessels, when the wharfage is obtained in the ordinary course of navigation on the engagement of the master or officers of the ship.

2. SAME—CREDIT OF THE VESSEL.

To sustain a maritime lien, there must be in all cases, either in fact or by presumption of law, a credit of the ship; and when such credit is negatived by the evidence no such lien, whether maritime or statutory, will be recognized.

3. SAME — PERSONAL CONTRACT FOR WHARFAGE. — OTHER CONSIDERATIONS INCLUDED.

Where wharfage was furnished to a steamship company under a contract which, for a single price per day, embraced other valuable considerations, the supply of which would give no lien on the ship, and which it was impossible to separate from the wharfage, and the contract did not look to any credit of the ship, but only to the personal responsibility of the company, it was held that no maritime lien was created for the wharfage.

Ullo, Ruebsamen & Cochrane, for libelants.

Carter & Ledyard and Mr. Baylies, for mortgagee, Atlantic Mut. Co.

BROWN, District Judge. The above libels were filed to procure payment out of the proceeds of the vessels above named, which upon their sale have been paid into the registry, for wharfage and for certain gunny bags, and the hire of an engine on the wharf used in the discharge of cargo, and for the engineer's services. The vessels were all owned by the United States & Brazil Mail Steamship Company, and belonged in this port, where all

the claims in suit arose. The defense is that none of the claims are maritime liens; and that no lien was acquired under the state statute, because no specifications were filed as required by the state law.

The bills for the Advance accrued in January and February, 1893; for the Allianca, from October to February; for the Seguranca, from September to February; for the Vigilancia, from October to February, 1893. The steamship company became insolvent in February, 1893, and a receiver was soon after appointed. These libels were filed in March and April following.

Ever since the decision of Benedict, J., in the case of The Kate Tremaine, in 1871 (5 Ben. 60, Fed. Cas. No. 7,622), it has been the law and practice in this district to recognize a maritime lien for wharfage furnished to domestic vessels, when the wharfage is obtained in the ordinary course of navigation, on the engagement of the master, or officers of the ship. See, also, The Allianca, 56 Fed. 609, 613. In all cases, however, to sustain a maritime lien, there must be either in fact, or by presumption of law, a credit of the ship; and whenever such credit is negatived by the evidence, no such lien, whether maritime or statutory, will be recognized. The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 396, 403. In the present case the wharfage was not furnished in the ordinary course of navigation, nor upon the request or upon any contract of the master, or any other officer of the ship. The evidence leaves no doubt that it was furnished in accordance with the terms of an unsigned memorandum of agreement, which had been previously drawn up upon negotiations between the libelant and the president of the steamship company some two years before, though the memorandum was never signed by the parties, through some difference as to the length of time the arrangement should continue, a consideration that in no way affects these cases. This oral agreement governed all the subsequent dealings of the parties, and the bills rendered were in conformity with it.

The agreement provided for the payment of $30 a day for "the entire use of the Robert pier," "for loading and discharging outward and inward cargoes, and also for receiving and storing freight on the pier pending the arrival of any of the company's steamers, and for such time as any steamer or steamers of the company may be in berth or berths for inward $\frac{\text{and}}{\text{or}}$ outward cargo on the wharf;" that the steamship company "for such day or days as it does not use the Robert pier, shall upon notification in writing two days in advance be relieved from the payment of $30 per day," the libelant to be notified four days prior to the arrival of the steamers. During occupancy by the ships it was "optional to use the pier for any and all purposes which may be considered for the best interests of said steamship company or any of its patrons." The agreement also gave the right "to use free of charge for outward freight on the ground floor, one of the libelant's stores (warehouses), the same not to exceed the amount of room the steamship

company has now the right to occupy; but to use the said ground only when the company cannot accommodate outward freight on the wharf with safety and security."

The agreement, it is obvious, embraced considerably more than ordinary wharfage rights. The contract rates were very much in excess of the statutory rates, evidently in consideration of the storage and other facilities offered. The contract was, in fact, rather a contract for the exclusive use of the wharf, and a partial use of the stores, upon certain days, having relation to the arrival and departure of the steamers for any purposes "useful to the steamship company, or its patrons," rather than for mere ordinary wharfage of the steamers. The price for the wharfage per day was the same, though the vessels differed much in size; the price was not according to tonnage, like the usual wharfage rates; and the payment was to continue so long as there was inward or outward cargo on the wharf, and until notice, whether any steamer was present or not. The bills of the libelant, moreover, were made out against the steamship company as personal demands; they were allowed to run as such for a considerable period; and no claim was ever made upon or against the vessels until after the company's failure, and a receiver of the company had been appointed. See The Kate, 56 Fed. 618. The whole number of days charged for and remaining unpaid is 148, amounting to $4,440.

I am constrained to find that there is no maritime lien in this case, (1) because whatever wharfage privileges were furnished, were furnished under a contract which for a single price per day embraced other valuable considerations, the supply of which would give no lien upon the ship, and it is impossible to divide the price per day into different parts; (2) because the evidence indicates beyond doubt, as it seems to me, that the dealings were upon a personal contract between the two companies, which did not look to any credit of the ship, but only to the personal responsibility of the steamship company. The J. M. Welsh, 8 Ben. 211, Fed. Cas. No. 7,327; The Stroma, 41 Fed. 599, affirmed 3 C. C. A. 530, 53 Fed. 281; The Curlew, 54 Fed. 899; The Allianca, 56 Fed. 609; The Kate, Id. 614.

As respects the gunny bags supplied for the purpose of reconditioning the broken parts of the cargo, as well as the use of the stationary engine on the wharf, and the services of the engineer in running it, it is impossible to distinguish the present cases from other cases of supplies furnished to domestic vessels in the home port. The Seguranca, 58 Fed. 908, 910.

The libels must be dismissed.