## THE ELECTRON.

### . ELECTRO–DYNAMIC CO. v. THE ELECTRON.

### BIGLER v. ELECTRO–DYNAMIC CO.

(Circuit Court of Appeals, Second Circuit. May 26, 1896.)

**1. CONTRACT OF SALE—CONSTRUCTION—GUARANTY OF HORSE POWER.**
Libelant contracted to refit a yacht with electric storage batteries, and rewind the original motor therein "so as to produce 15 horse power, or 25 horse power as a spurt, or to produce readily about 10 horse power at ordinary service." *Held* that, in the absence of any definite explanation, this amount of horse power was to be developed in the battery and wires for delivery to the machinery, subject to such frictional diminution in the machinery itself as might intervene between the ends of the wires and the propeller blades. 56 Fed. 304, affirmed.

**2. ADMIRALTY JURISDICTION—MARITIME LIENS—STATE STATUTES.**
The federal admiralty courts cannot enforce a lien claimed under a state statute for materials and repairs furnished to a foreign vessel, unless it appears that credit was given to the vessel.

**3. SAME—WAIVER OF OBJECTIONS—FILING OF CROSS LIBEL.**
In a suit in rem to enforce an alleged lien under a state statute, the filing by defendant of a cross libel in personam, and obtaining a stay of proceedings on the original libel until security to respond in damages is given, *held* not to operate as a waiver of objections to the existence of any maritime lien.

**4. SALE—IMPLIED WARRANTY OF RIGHT TO USE—EVICTION UNDER PATENT.**
On a sale of personal property there is an implied warranty of the purchaser's uninterrupted right to use the article purchased, especially when such use is indispensable to the continuance of the business for which it was purchased; and if the purchaser is prevented from using it by a third person having a valid patent covering the article in question, this is an eviction, which will constitute a defense to an action for the price.

**5. SAME—WHAT CONSTITUTES AN EVICTION.**
Mere notice by a third party of his claim that an article purchased infringes a patent owned by him is not of itself an eviction of the purchaser, so as to show a breach of the seller's implied warranty of a right to use.

**6. SAME.**
Where certain electrical machinery was sold, and the purchaser used it for one season, after which he was notified by a third party of a claim of infringement of a patent owned by the latter which had been sustained by the courts, *held*, that this breach of implied warranty of a right to use did not, under the circumstances, constitute a perfect defense against the payment of any part of the purchase price.

Appeal from the District Court of the United States for the Eastern District of New York.

This was a libel by the Electro-Dynamic Company against the yacht Electron, James Bigler, claimant, to recover a balance alleged to be due of the price of certain supplies and repairs. The claimant filed a cross libel in personam to recover damage for an alleged breach of the contract under which the repairs were furnished, and the court granted a stay of proceedings on the original libel until security was given for the damages claimed under the cross libel. 48 Fed. 689. Afterwards the case was heard upon the merits, and the court below entered a decree for libelant, and

dismissed the cross libel. 56 Fed. 304. The owner of the yacht appealed.

Geo. Bethune Adams, for appellant.

H. Galbraith Ward, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. James Bigler of Newburgh, N. Y., was the owner of the Electron, an iron yacht of 37 feet in length, which was supplied with electrical motive power. He lengthened her to 75 feet by cutting her in two and filling in the space with the same breadth of beam. On February 28, 1891, he accepted the written offer, dated February 17, 1891, of the libelant, the Electro-Dynamic Company, a corporation of Philadelphia, the important portion of which was as follows:

"I have just seen Mr. Bates, who confirms the rough estimate I made to you the other day in answer to your request for a price on refitting the Electron with two hundred and fifty (250) cells of storage battery, and with the original motor rewound so as to produce 15 horse power, or 25 horse power as a spurt, or to produce readily about 10 horse power at ordinary service. We therefore propose to furnish you with two hundred and fifty (250) new cells of '22 M' accumulators, rewind one motor, supply two (2) new armatures, supply all necessary switches and wiring and ten (10) incandescent lamps and sockets for the sum of four thousand and ten dollars ($4,010), payable two thousand dollars ($2,000) cash on delivery of the material at Newark, N. J., ready to go on the boat, and one thousand dollars ($1,000) in a sixty-days note, and one thousand and ten dollars ($1,010) in a 90-days note, interest added, drawn to your order, and indorsed by you."

All the apparatus, except the batteries, were made by the libelant at its factory in Philadelphia. The batteries were made for the libelant by another corporation, called the Electrical Accumulator Company, at its factory in Newark, N. J. The yacht was sent to Newark to be equipped with the batteries, where the apparatus of the libelant was also put in for the sake of convenience. After the equipment had been put on board the boat, a portion of the purchase price was paid, leaving a claimed balance of $2,106.08, which Mr. Bigler refused to pay, whereupon the libelant brought a libel in rem against the Electron to recover the unpaid amount which the libel alleged had been furnished upon her credit.

The answer of the owner and claimant alleged that the vessel was delivered to the libelant upon certain assurances made by its officers as to the horse power, velocity of wheel, and increased speed which would be produced by the new machinery, but that, "after the work had been performed, it was found that the electrical equipment so supplied by libelant did not produce either the horse power or the revolutions of the wheel which were contracted for and guarantied by libelant as aforesaid, but that the same totally failed to produce the said horse power, or the said velocity of wheel, or the increased speed which was the object of said agreement." The answer further alleged that, although a new wheel was put in the boat by the claimant at libelant's request, the promised horse power and velocity were not produced, that the apparatus and equipment were defective, and that many

of the cells were of inferior workmanship. The answer further alleged that the batteries furnished by libelant were an infringement of patents owned or controlled by the Brush Electric Company and others, and that before said contract it had been adjudged that such batteries were covered by said patents; that he was not informed of said suits by libelant, and was ignorant of the same until he was notified on October 19, 1891, by the owner of the patents or a licensee, that said batteries were an infringement, and was threatened with a suit for using the same, and that, if he continued to use the same, he would subject himself to further liability; and that he had offered to return to libelant all the electrical equipment and apparatus. The claimant also filed a cross libel in personam against the Electro-Dynamic Company, which made the same allegations, and prayed for the recovery of the damages which he had suffered.

The principal defense upon the merits is that the new batteries and the rewinding of the motor did not produce the horse power which was guarantied in the letter of February 17th, and that neither the speed which was expected from the number of revolutions of the wheel, which had been referred to, and which Mr. Bigler supposed had been promised, in conversations which took place before February 17th, nor said number of revolutions, had been produced. It is obvious that these conversations could not be introduced to add to the requirements which had been embodied in a written contract deliberately entered into, and of which no reformation had been called for by either party. But the district judge admitted conversations which were offered to show the definition by the parties of the expression "to produce horse power," and by that means quite an amount of testimony in regard to anticipated revolutions came into the record. The theory of Mr. Bigler is that the previous conversations showed that the guarantied horse power was to be delivered to the screw or transmitted to the propeller, and that from 10 to 15 horse power would produce 800 revolutions per minute on point 2, and that 25 horse power would produce 1,400 revolutions on point 3. The libelant's definition of the disputed term is that the horse power was to be developed or produced in the battery and wires and delivered to the machinery, but that diminution must be expected to take place between the wires of the battery and the propeller blades. Reliance upon the accuracy of Bigler's recollection in regard to the strength of the assurances or promises which were made before February 17th, respecting the number of revolutions or the expected speed, is impaired by his letter to the president of the libelant corporation of March 11, 1891, in which he says:

"I am anxious to get some information in reference to the velocity of the wheel as proposed to be run by the new motor. Please state as near as you can the No. of revolutions on the 3 feeds as you propose the motor will run. The wheel is 26" in diameter; the pitch is 15"; I think, too light."

On March 28th Bigler again wrote as follows:

"I would also ask, as I have done before, the velocity of the motor on the three speeds which she is expected to run."

To these requests the libelant replied on April 9th as follows:

"Since you were here, a rough calculation of the probable speed of the motor-under the best conditions gives the following results: Minimum speed, 400 revolutions per minute; ordinary speed, 800 revolutions per minute; maximum speed (to be used not more than 3 or 4 minutes at a time), 1,400 revolutions per minute. The speed of the motor depends upon the pitch and diameter of the screw, so that the speeds above given are only approximate, and can be varied, at your pleasure, by varying the screw."

This correspondence indicates that no positive assurances had been given before the date of the contract as to the velocity of the wheel, or the number of revolutions, or as to the effect of the horse power, as produced in the battery, upon the propeller. The record satisfies us that no such assurances were given, or could honestly have been given; for while Mr. Griscom, the president of the libelant, was an electrical engineer, he was not a boat builder, and, while he thought he knew what his batteries would produce, he did not know the effect of this electric power upon the blades of the propeller. On the other hand, Mr. Bigler, who was a boat builder, and had altered his boat at a very considerable expense, to make her an excursion boat, and had inferred that a certain amount of horse power would produce a certain result, was very much disappointed that the expected speed was not attained, and naturally concluded that the guarantied power had not been produced.

We concur in the conclusions of the district judge, which he stated as follows:

"It is evident that the whole subject was in the nature of an experiment, in which, whatever may have been the hope or expression of confidence by either party as to the result in increased speed, no warranty or guaranty was assumed by the libelant. Even down to the trial, the simple question, what was the amount of horse power delivered at the propeller blade, over and above all friction of machinery, was left undetermined, and is still uncertain; so that, if the contract were held to import an obligation to supply so much effective power at the propeller, the evidence would not establish any breach. One object of the admission of evidence in regard to the conversations of the parties in reference to power was to ascertain the common understanding of the parties, if there was any, as to what was intended by producing or developing so much horse power. In the absence of any definite evidence to the contrary, I should hold that this phrase, as applied to an electric battery, meant the horse power developed in the battery and wires and delivered to the machinery, subject to such frictional diminution in the machinery itself as might intervene between the ends of the wires of the battery and the propeller blades. If the latter view be correct, the evidence shows that the agreement was more than fully performed. The evidence does not sustain the charge of bad material or bad workmanship."

The answer also denied that the equipment had been furnished upon the credit of the vessel. The libelant, a Pennsylvania corporation, had placed in the boat at Newark, N. J., the machinery, which it built at Philadelphia, and the batteries, which it purchased from a New Jersey corporation, the boat being owned by a citizen of New York. The libelant relies for the stability of its lien upon the statute of New Jersey, which provides as follows:

"Whenever a debt shall be contracted by the master, owner, agent or consignee of any ship or vessel within this state for either of the following purposes: 1. On account of any work done or materials or articles furnished in

this state, for or towards the building, repairing, fitting, furnishing or equipping such ship or vessel; * * * such debt shall be a lien upon such ship or vessel, her tackle, apparel and furniture, and continue to be a lien on the same until paid. and shall be preferred to all other liens thereon, except mariners' wages." Revision N. J. pp. 586, 587.

The facts show that, whatever presumptions might arise from the existence of the statute in regard to the repairs having been furnished upon the credit of the vessel, they were not so furnished. The contract was made with the owner upon his credit exclusively. Upon these facts, two questions of law arise: (1) Can a state create a lien upon foreign vessels, which a federal court of admiralty will enforce? and (2) can the state statute be so construed in a court of admiralty as to attach a lien upon a foreign vessel for supplies which were not furnished upon its credit?

The first question has been, in substance, certified in another cause by this court to the supreme court. Inasmuch as it may be answered, although the cause may be properly disposed of without an answer to that particular question, the subject of the power of states to create by their local statutes liens upon foreign vessels will not now be considered.

The second question relates to the limitations, if any, that a court of admiralty must necessarily place upon liens upon foreign vessels which are created by state statutes which do not, in terms, provide that the protected repairs or supplies must be furnished upon the credit of the vessel. The authoritative exposition of the manner in which liens created by state statutes upon domestic vessels are to be made beneficially operative by admiralty courts is contained in the well-known case of The Lottawanna, 21 Wall. 558, in which the supreme court again declared that, according to the maritime law as accepted and received in this country, those who furnish necessary materials, repairs, and supplies to a vessel in her home port, upon her credit, do not have, in the absence of federal legislation upon the subject, a lien on the vessel. But different states had passed statutes, which, though varying in language, permitted a lien to be placed for repairs furnished to a vessel in her home port, and therefore a practical difficulty had arisen in regard to the method by which such statutes could be enforced. Inasmuch as the maritime law of this country had not permitted such liens, and as congress had not regulated the subject by statute, it was conceded that the states might, by legislation, declare the rights of material men over vessels in their home ports, as the states had exercised jurisdiction in the absence of federal legislation upon the subject of pilotage. To meet the difficulty in regard to the enforcement of state liens by proceedings in rem in the state courts, which would impinge upon the exclusive admiralty jurisdiction of the United States district courts, the court said:

"State laws, it is true, cannot exclude the contract for furnishing such necessaries from the domain of admiralty jurisdiction, for it is a maritime contract, and they cannot alter the limits of that jurisdiction; nor can they confer it upon the state courts, so as to enable them to proceed in rem for the enforcement of liens created by such state laws, for it is exclusively con-

ferred upon the district courts of the United States. They can only authorize the enforcement thereof by common-law remedies, or such remedies as are equivalent thereto. But the district courts of the United States, having jurisdiction of the contract as a maritime one, may enforce liens given for its security, even when created by the state laws. The practice may be somewhat anomalous, but it has existed from the origin of the government."

The anomalous character of the practice which enabled district courts to enforce liens which the maritime law declared were not liens, and "the inconveniences arising from the often intricate and conflicting state laws creating such liens, induced the supreme court, at its December term, 1858, to allow proceedings in personam only; but, a subsequent modification of the rule having permitted proceedings in rem or in personam, at the option of the libelant, the court in the Lottawanna Case further said:

"Of course, this modification of the rule cannot avail where no lien exists; but where one does exist, no matter by what law, it removes all obstacles to a proceeding in rem, if credit is given to the vessel."

If full force is given to the last clause of the sentence, it is an implication that no proceeding in rem can be had against domestic ships, if no credit had been given to the vessel, and that such credit necessarily preceded any lien which could be recognized by an admiralty court. In The Howard, 29 Fed. 604,—a case arising under the New Jersey statute,—this was understood by Judge Wales to be the law of The Lottawanna. The case was one of supplies furnished to charterers at the home port in New Jersey, where both libelant and owners resided, and was regarded as one exclusively of fact, and upon a finding that no credit had been given to the vessel the libel was dismissed. The same question arose before the court of appeals for the Sixth circuit in The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 396. The libelants were coal merchants in Detroit, who furnished coal to a steam barge which was owned by citizens of Buffalo, a citizen of Michigan and of New York, was enrolled at Buffalo, and had been chartered by a Detroit corporation, which had agreed to pay her expenses. The district and the appellate courts found that the coal was furnished on the credit of the charterer, and not of the vessels, and were of opinion that her home port was, at the time of the sale, the port of the charterers, for the purpose of determining whether a lien attached, and that a lien under the state statute of Michigan did not attach, unless the supplies were furnished on the credit of the vessel. The statute gave a lien upon all vessels above five tons burden used in navigating the waters of Michigan "for all debts contracted by the owner or part owner or master * * * on account of supplies and provisions furnished for the use of such water craft." The coals were ordered by the master. The position of the court of appeals was that the court must import into a state statute of this kind the limitations which, under the principles of admiralty, are applicable to maritime liens of the same general class. In support of this position it urged that the state statutes were passed to overcome the result of the decision of The General Smith, 4 Wheat. 443, and place material men, whether in a home or in a

foreign port, upon an equality; that, therefore, it is to be presumed that the legislature intended that the lien should have the characteristics of a maritme lien; that a court of admiralty has no jurisdiction to enforce liens unless they are maritme, and that an admiralty lien for supplies does not exist unless they were furnished on the credit of the vessel. The conclusion of the court was that it followed from this line of reasoning and from the authorities (The Young Mechanic, 2 Curt. 404, Fed. Cas. No. 18,180, and The Guiding Star, 18 Fed. 263) that "courts of admiralty will not enforce a maritime lien against a vessel for supplies created by a state statute, unless the supplies were furnished on the credit of the vessel, for that is indispensable to the existence of maritime liens of this class." The circuit court of appeals for the Ninth circuit, in Lighters Nos. 27 and 28, 6 C. C. A. 493, 57 Fed. 664, followed The Samuel Marshall, and for the same reasons. Judge Hoffman, in the same circuit, had previously insisted upon the necessity of credit to the vessel as a prerequisite to a lien under the statute of California. The Columbus, 5 Sawy. 487, Fed. Cas. No. 3,044. Since the opinion of the district court in this case was written, Judge Brown has also decided the question of the necessity of credit to the vessel, with reference to the New York statute, in the same way. The Kate, 56 Fed. 614; The Advance, 60 Fed. 766.

The foregoing cases were of liens by virtue of state statutes upon domestic vessels, or those which, for the purpose of a lien, were regarded as vessels in their home port. The argument is stronger in regard to the necessity of requiring the credit of the vessel as a prerequisite to a lien upon a foreign vessel under a state statute. This class of statutes was created to supply a supposed defect in the maritime law of this country in regard to a lien for supplies furnished to domestic vessels upon their credit. In regard to foreign ships, there was no defect in the maritime law of the country, for the principles of the general law of the sea had been abundantly declared to be the law of the United States, and it is not to be supposed that the various states undertook to enlarge the maritime law in respect to liens upon foreign vessels by introducing a new element into local laws, and furnishing material men with a new kind of a lien, and thus to enlarge the admiralty jurisdiction of the district courts of the United States. It has been repeatedly declared (The St. Lawrence, 1 Black, 526; The Lottawanna, supra) that state laws cannot enlarge the limits of admiralty jurisdiction, but that result would necessarily follow if each state could abolish old limitations, and change existing requisites for maritime liens upon foreign vessels. Assuming that every local statute upon the subject of maritime liens upon foreign vessels is not beyond the power of a state to create, it is reasonably certain that it is beyond the power of the district court to carry into full effect a state statute which abolishes the principle upon which the maritime law of the country has declared that such liens rest. For that purpose the statute must be construed to imply that the repairs were furnished upon the credit of the vessel.

The libelant suggests that the claimant has waived any objection to the existence of a maritime lien upon the boat by his conduct in filing a cross libel in personam, and obtaining a stay of proceedings upon the original libel until security to respond in damages should be furnished. This suggestion is not well grounded. Bigler did not object, by plea or otherwise, to the jurisdiction of the court. It had full jurisdiction to ascertain the validity of the alleged lien, which was in issue under the answer, and thereby obtained jurisdiction of the cross libel, the subject-matter of which arose "out of the same cause of action for which the original libel was filed." Admiralty Rule 53. By bringing a cross libel, the claimant lost no defense which was properly set up in the answer. The boat made her trial trip in June, 1891. She ran thereafter upon excursion trips of about 45 minutes in duration, from Atlantic City to the ocean, 3 days in June, 18 days in July, 29 days in August, making several trips each day, and in September went to Newburgh, where the cells were taken out. In the matter of speed she appears to have been unsuccessful. The libel was filed on September 22, 1891. On October 19th the Consolidated Electric Storage Company, the licensee of two patents granted to Charles F. Brush for improvements in secondary batteries, known as the "Brush Patents," notified Bigler that the cells which he was using in his boat were an infringement, and that it should claim damages for their use. It appears from the records of this court that these patents had been in litigation between the Brush Electric Company and the Electrical Accumulator Company in the Southern district of New York, and that on July 23, 1891, an opinion was filed in that court (47 Fed. 48) which sustained their validity and directed an injunction. From the decree dated October 13, 1891, an appeal was promptly taken to the circuit court of appeals and the decree of the circuit court was, in substance, sustained on October 4, 1892. 2 C. C. A. 682, 52 Fed. 130. The operation of the writ of injunction was suspended for 30 days from the date of the decree, with leave to the defendants to apply for a further suspension, or for the vacation of the injunction in case it should appear to the court that the complainant or its said licensee were not prepared to deliver to the defendant or its customers the types of batteries made by it at the prices which were specified. The company which made the cells for the Electron was the successor of the defendant in the Brush suit. Bigler offered, by letter of November 18, 1891, to return the machinery to the libelant, and filed his cross libel November 28, 1891. It was conceded upon the trial of the libel and the cross libel that similar cells to those which the Electro-Dynamic Company supplied to the yacht were in the litigation upon the patents which were held to be infringements. The libelant in the cross libel proceeded upon the theory of a rescission of the contract, and also that he had been evicted, and asked for a repayment of all the sums which he had paid, for a cancellation of his outstanding notes, and for additional damages. The district court allowed to the defendant in the libel the

damages for the interruption to the further use of the battery from October 19, 1891, deducted the amount, which was determined to be $801.98, from the amount of the unpaid contract price, and directed a final decree for payment to the libelant of the balance, interest and net costs, amounting in all to $1,747.18, which had the effect of dismissing the cross libel. The claimant and the cross libelant appealed.

In view of the facts which have already been found in regard to the alleged violation of the provisions of the contract, the suggestions which remain to be considered are those arising out of the fact that the cells, when furnished, were infringements of valid patents. Upon the sale of personal property in the possession of the vendor there is an implied warranty of title, and there must be the same implied warranty of the purchaser's uninterrupted right to use an article which the vendor sells to him; especially when, as in this case, its use is indispensable to the continuance of the business for which it was purchased. If the purchaser is prevented from the use of the purchased property,—in other words, if he is evicted,—he has a defense to an action for the purchase price. Bigler was not evicted, for a mere notice of the claim of infringement by the owner of the patent is not an eviction (Consumers' Gas Co. of Danville v. American Electric Const. Co., 1 C. C. A. 663, 50 Fed. 778); and in view of the condition of the original order of injunction against the Electrical Accumulator Company it is not probable that an injunction would have been issued against him pending the appeal. But he offered to return the equipment, and had attempted to rescind the contract, and therefore could have "an action upon the implied warranty, and, of course, a defense to an action for the purchase price." McGiffin v. Baird, 62 N. Y. 329; Case v. Hall, 24 Wend. 102. He was entitled at least to a reduction from the purchase price by reason of the breach of warranty of the right of uninterrupted use, and he insists in his seventh exception that the libelant's sale of infringing articles constituted a complete defense to its claim. It is true that the new cells constituted a material part of the repairs which were furnished, but they constituted a part only. The boat had been used for a portion of the summer season, and the use of the cells was certainly not interrupted before October 19th. It cannot be said, as matter of law, that the breach of warranty constituted a perfect defense against the payment of any sum whatever, and, while there is an exception, because the district court sustained the exceptions to the commissioner's report, as the record contains none of the evidence upon which the commissioner or the district court acted, there are no data by means of which this court can ascertain whether the amount which was finally allowed was inadequate.

The cross libel of Bigler cannot be sustained, because his damages are less than the amount which he owes, and no decree in personam should be rendered in his favor when his debt to the libelant is unpaid.

A decree in rem cannot be rendered in favor of the libelant, for the repairs were not furnished upon the credit of the vessel.

The decree of the district court is reversed, without costs, except so much of the decree as dismissed the cross libel.