## THE ALLIANCA.

### MORGAN IRON WORKS v. THE ALLIANCA.[*]

(District Court, S. D. New York. May 29, 1893.)

**1. WHARFAGE—WHEN DOES NOT ACCRUE—REPAIRER'S WHARF.**
Where a steamship went to the wharf of an iron-works company solely for the purpose of being repaired, and for the convenience and use of the company in making such repairs, for its own profit, held, that wharfage, in the ordinary sense, did not accrue.

**2. SAME—EVIDENCE AS TO CONTRACT FOR WHARFAGE.**
There was evidence of a verbal agreement by an iron-works company to waive any charge for wharfage in making repairs on a steamship. The vessel went to the wharf solely for such repairs. No charge for

'Reported by E. G. Benedict, Esq., of the New York bar.

wharfage had ever been made before in repairing the vessel, nor is it usual to make such charge. Although bills for the repairs were thereafter rendered, no bill for wharfage was presented until after the failure of the steamship company, four months later. *Held*, that wharfage could not be recovered.

3. SAME—MARITIME LIEN—FOREIGN VESSEL.
A maritime lien is created by the furnishing of wharfage to a foreign vessel.

4. SAME—DOMESTIC VESSEL.
Semble, that a maritime lien arises for wharfage furnished to a domestic vessel.

5. SAME—LIEN UNDER STATE STATUTES—DOMESTIC VESSEL—SPECIFICATIONS.
No statutory lien is acquired, under the laws of New York, against a domestic vessel, for wharfage, unless specifications of lien are filed within 30 days after the debt is contracted.

In Admiralty. Libel by the Morgan Iron Works against the steamship Allianca for wharfage. Dismissed.

Owen, Gray & Sturges, for libelant.

Carter & Ledyard and Mr. Baylies, for mortgagees, intervening defendants.

BROWN, District Judge. The libel in this case was filed to recover for an alleged claim of wharfage against the steamship Allianca between May 26 and September 17, 1892, while she lay along the wharf at the foot of Ninth street, East river. This wharf and some adjoining property was occupied by the libelant, as lessee, exclusively for carrying on its iron works, which included as a part of its ordinary business the repair of vessels. The Allianca was owned by the United States & Brazil Mail Steamship Company, a domestic corporation. She was sent to the libelant by that company for repairs, and for no other purpose. The repairs were completed, and she left the pier on the 17th September, 1892. In October a bill for the repairs made upon her was presented to her owners, amounting to $13,034.89, on which $5,000 had been paid on account in July, and $5,000 in September. The bill contained no charge for wharfage. The steamship company became insolvent in February, 1893, and no claim for wharfage was made until thereafter, nor until about the time the above libel was filed, on February 27, 1893.

The steamship in this case did not make any use of the wharf for any of those uses for which wharfage or dockage is ordinarily charged. She was not there for the purpose of receiving or discharging cargo, nor for the purpose of safety or protection, nor as a place of mooring; but simply for the purpose of receiving repairs from the libelant in the ordinary course of its business. She was there for the convenience and use of the libelant in making repairs on her for the libelant's profit; and she was in the libelant's possession, as much as if she were on the ways for repairs in a shipyard. Wharfage, therefore, in the ordinary sense would not accrue. Transportation Co. v. City of Parkersburg, 107 U. S. 691, 699, 2 Sup. Ct. Rep. 732; Pelham v. The Woolsey, 16 Fed. Rep. 418, 423; The Geo. E. Berry, 25 Fed. Rep. 780, 781.

As a part of the contract for repairs, or as determining the price to be paid therefor, no doubt it was competent for the parties to stipulate expressly for some compensation for the incidental use of the wharf during the repairs, or for the facilities which the libelant afforded in having its works upon the wharf; just as a separate charge may be made for docking, or hauling on the ways. For the libelant it is claimed that the testimony of Mr. Ivins, the president of the Brazil Mail Steamship Company, shows that wharfage was to be charged as a separate item. Mr. Ivins' language, however, with the other circumstances of the case, seem to me not to warrant this conclusion. Referring to his conversation with Mr. Weed, who acted for the libelant, he said:

"We discussed the question of wharfage in (making) the contract, and I told him in case prompt payment was made that he ought not to charge us any wharfage while the vessel was lying there, stating that the item of wharfage at the Erie Basin was one of the things I wanted to save by moving the ship at that time to his yard. He agreed to that, and the arrangement between us was finally closed, as nearly as I remember, in the last week in May. * * * Question. Do I understand you to say that the item of wharfage was waived upon condition that there should be prompt monthly payment? Answer. He wanted to make a charge of wharfage at the time. I told him I thought he ought to waive that, in view of the fact that we were giving him the work, and that it was a very large item, and it was—prompt payment being made—understood between him and me and the executive committee and myself, that in consideration of his doing the work, we already being largely his debtor, he should be paid from month to month as his work was done."

It is clear from the evidence that no claim was made by the libelant for payment from month to month. No bill was rendered for work done until some time after the whole work had been completed, in October, and meantime the work had been in fact three-fourths paid for. There is no evidence that these payments were not made as promptly as was desired by the libelant, and as promptly as had been agreed on; if not, the failure to render any account from month to month, or to make any request for payment during the progress of the work, shows that the strict performance of that part of the verbal arrangement was waived.

The libelant had been long accustomed to do repairs upon the steamship company's vessels, and no charge for wharfage had ever been previously made; nor is it usual to make any such charge. Mr. Weed was one of the directors of the steamship company itself. Throughout Mr. Ivins' testimony, both in the direct and in the cross examination, he fails anywhere to state that there was any agreement to pay wharfage; and no one connected with libelant's company testifies to any such agreement. The rendition of the bill so late as October without any charge for wharfage, and the fact that no claim to wharfage was made until after the failure of the company four months later, satisfy me that there was no expectation or agreement at the time the vessel was sent to the libelant for repair that wharfage was to be paid; and that any charge therefor was waived in consideration of Mr. Ivins' agreement that the general indebtedness of the steamship company to the libelant should be reduced, and that payments should be made

promptly. There is no evidence that the steamship company's debt was not reduced, as agreed; the inference is that it was. As for the repairs, the evidence shows that three-fourths of the amount of the whole bill were paid before any bill was rendered, or any call for money made. Considering that the exclusion of wharfage was one of the express objects which Mr. Ivins had in view, and that this contract on the steamship company's part was to so large a degree performed, and was to some extent waived by the libelant itself, by not calling for monthly payments, and that no wharfage was ever claimed till after the company's failure, I am not satisfied that there was such an agreement as can sustain the wharfage claim.

Upon the above view of the facts it is unnecessary to consider at any length the other question discussed on the argument, namely, whether under the maritime law, or under the New York statutes in regard to wharfage, any lien upon the ship would exist, if the payment of wharfage had been agreed upon. The supply of wharfage being a maritime service, undoubtedly gives rise to a lien upon the vessel therefor, if she be a foreign vessel. Ex parte Easton, 95 U. S. 68. If the vessel be a domestic vessel and in her home port, as in this case, then so far as the question of lien depends upon the statutes of the state, none could here be recovered; because the law of 1885, c. 273, which gives a lien "on account of wharfage and expenses of keeping such vessel in port," etc., further provides expressly that the debt shall "cease to be a lien in all cases unless a specification thereof," etc., "be filed within 30 days after the debt was contracted;" and in this case no such specification was filed. This act controls that of 1882.

Aside from the statute, however, the question still remains whether the furnishing of wharfage, that being a maritime service, does not give rise to a lien under the maritime law, as in the case of other services to the ship rendered by seamen, salvors, pilots, tugs, etc. In the case of The Bob Connell, 1 Fed. Rep. 218, it seems to have been supposed that the supreme court in the case of Ex parte Easton, supra, had held that there was no maritime lien for wharfage furnished to a vessel in her home port. But this was pointed out by Mr. Justice Blatchford in the case of The John M. Welch, 18 Blatchf. 54, 2 Fed. Rep. 364, to be erroneous, as the supreme court expressed no opinion on that point; and the question was left by Judge Blatchford undecided. Page 77, 18 Blatchf., and page 386, 2 Fed. Rep. If the lien is a maritime one, as against a domestic vessel, then the provision of the state statute declaring that the lien shall cease unless specifications thereof be filed within 30 days after the debt was contracted, would be inoperative; since state legislation cannot destroy or impose conditions upon maritime liens. The Barque Chusan, 2 Story, 455; The Lottawanna, 21 Wall. 558, 575; The H. E. Willard, 52 Fed. Rep. 389; The Lyndhurst, 48 Fed. Rep. 839.

Upon the general question whether wharfage furnished to a vessel in her home port should be held to give a maritime lien or not, my own judgment is that it should, though intimations in some

cases may be found to the contrary. The exceptional rule of this country as regards repairs and supplies furnished to domestic vessels ought not, I think, to be extended by analogy to such a maritime necessity as wharfage. See Chapman v. Engines, etc., 38 Fed. Rep. 671, 672. There is no true analogy between the two subjects, as respects those circumstances which form the basis of our exceptional rule in regard to repairs and supplies. The latter, when made in the home port, or in dealings with the owner, are presumed to have been made on the personal credit of the owner; because they are not usually made in the course of a voyage, or under any necessity of completing a voyage, but under the ordinary conditions of nonmaritime contracts. Hence they are ordinarily a subject of express bargaining, or of a direct order, with ample time for deliberation, and for decision by the creditor whether to trust the owner personally or not; while if the case be in fact a case of danger, where immediate service is necessary, then it may become a case of salvage, for which a maritime lien at once arises, though the vessel be in her home port.

Wharfage, on the other hand, is often a matter of immediate and pressing necessity, either for safety, or for the completion of the ship's voyage, and for the full performance of her maritime duty. It is not usually a matter of bargaining, or of direct order. The needs, and the safety of vessels, often admit of no delay for inquiry, or for deliberation by the creditor. As a general rule it would be greatly prejudicial to the interest of commerce and of shipping, if the wharfinger were not to be allowed to furnish wharfage instantly to a domestic ship when needed, as readily as to a foreign ship, and upon the credit of the vessel alone; or if he were to be held bound, before admitting a vessel to wharf privileges, to ascertain at his peril the residence, personal credit, and responsibility of her owner as in the case of supplies. A wharfage service, as respects immediate need, and the absence of opportunity for personal dealing or inquiry, is most analogous to towage, pilotage, or salvage, which, aside from statute, give a lien on domestic vessels. Sup. Ct. Rule in Admiralty 14; The Mystic, 30 Fed. Rep. 73; The John Cuttrell, 9 Fed. Rep. 777; The California, 1 Sawy. 463; The George S. Wright, 1 Deady, 591; Chapman v. Engines, etc., 38 Fed. Rep. 671, 672. The charges for wharfage are, moreover, comparatively small in amount; they are usually expected to be collected on the spot, and from the ship herself; and the interests of commerce are clearly promoted by following the general marine law of most maritime countries in treating wharfage facilities, like towage, as supplied directly to the ship, and upon the credit of the ship, for which the law allows a maritime lien. This was the conclusion reached by Judge Benedict upon an exhaustive consideration of the matter in the case of The Kate Tremaine, 5 Ben. 60, 66–68, and the practice in this district since has been in conformity with that decision. For the reasons previously stated, however, the libel must be in this case dismissed, with costs.