## THE RICHARD WINSLOW.

### NORTON et al. v. THE RICHARD WINSLOW.

(District Court, E. D. Wisconsin. April 17, 1895.)

1. CARRIERS—TERMINATION OF CARRIAGE— CHARACTER OF LIABILITY.
   In November, 1893, a cargo of corn was shipped on a schooner at Chicago, to be carried to Buffalo, the bill of lading providing that the charge for freight should include free storage in the vessel at Buffalo until April 1, 1894. On arrival at Buffalo, the cargo was inspected and found in good order. Thereafter the vessel remained moored at a wharf, in charge of the captain. During the winter, in consequence of an unusually low tide, the vessel grounded, and was thereby strained and caused to leak, whereby the cargo was damaged. *Held*, that the liability of the owner of the vessel, as carrier, ceased on her arrival at Buffalo, and thereafter his liability was that of a warehouseman only.

2. ADMIRALTY—JURISDICTION—CONTRACT FOR STORAGE ON VESSEL.
   *Held*, further, that the water-borne character of the contract ceased on the arrival of the vessel at Buffalo, and the admiralty had no jurisdiction of the claim for damages to the cargo while lying in the vessel as a mere storehouse.

**8. Shipping—Harter Act.**

It seems that, even if the contract were maritime, the vessel would be relieved of liability under the Harter Act (Laws 1893, c. 105), the vessel having been properly manned and equipped, and the fault, if any, having been in the management of the vessel during the winter.

This was a libel by J. Henry Norton and others against the schooner Richard Winslow for damages to a cargo of corn.

The schooner Richard Winslow received at Chicago, November 16, 1893, a cargo of corn to be carried to Buffalo. The bill of lading states that the lake freight is three cents per bushel, "including free storage in vessel in Buffalo harbor until April 1, 1894, to be unloaded at shipper's option on or before April 1, 1894." The vessel arrived at Buffalo November 22, 1893. The cargo was then examined by two "surveyors," one selected by the consignee, and the other by the carrier, and they certified that it was in good condition and uninjured. The vessel was thereupon moored at a wharf, pursuant to direction by the shipper, and remained during the winter in charge of the master as ship keeper. In February there occurred heavy northeast gales, which lowered the water in the harbor to an extraordinary degree, and the answer states that it caused "said schooner to take the bottom, and strained the butts of her deck, hatch combings, and mast apartment, without any fault or neglect" on the part of the respondent; that, in consequence thereof, "a portion of the cargo was found to be wet during the winter, and was taken out, and when the schooner was discharged in the spring" 820 bushels of corn was "in bad condition, and the remainder somewhat damaged." The cargo was delivered April 7, 1894, and the consignee then paid the freight, but claims $2,202.64 for damages to the corn under the circumstances shown. After the inspection by the "surveyors" on arrival, and in accordance with their suggestion, "the hatches were put on and covered with tarred paper and canvas covers." The "surveyors" made another examination after the February storm, and removed some wet corn, but pronounced the remainder safe, and closed the hatches. The testimony is undisputed that they looked over the deck and hatches and found no signs of openings from the strain, and that the decks were kept clear of snow throughout the winter. The libelants claim, and their testimony shows, that the grounding and listing of the vessel would tend "to strain the deck and open the butts on deck and hatches," and cause leakage; that the safest precaution was to try the seams with a knife, and go over them with the calking iron, immediately after the vessel was restored to position. The testimony does not indicate that such measures were either suggested or adopted. The libelants further show that the vessel owner was living at Buffalo, was frequently about the vessel during the winter, was an experienced mariner, and they therefore claim he should have known of and adopted these requirements for protection of the cargo.

Schuyler & Kremer, for libelants.

Van Dyke & Van Dyke, for claimant.

SEAMAN, District Judge (after stating the facts as above). The practice of utilizing vessels, when laid up for the winter, as storehouses for grain has become frequent in the ports of the Great Lakes. The shipper thereby saves elevator charges, and the vessel owner secures a cargo. The transportation may precede the storage, or may close it; in either scheme the storage extends to the opening of navigation in the spring. In view of this practice, the questions involved in this case have special importance, and I have given them careful consideration. In the hope and expectation that they will be taken up by appeal, and thus become settled for this circuit, a brief statement of my conclusions will suffice for the purpose of a decree here.

1. Upon the facts it is clear and undisputed that the damages for which a recovery is sought by this libel originated after the vessel had completed the transportation,—after arrival in Buffalo, inspection of the cargo, mooring and dismantling the vessel for the winter, and covering the hatches to protect the corn. It is the general rule of law respecting carriers of goods that their liability as carriers terminates with the service of transportation, after a reasonable time and opportunity for the consignee to accept and remove them, and that for any storage thereafter, or any storage previous to and while awaiting orders of the shipper for forwarding, the liability is that of a warehouseman only. Pars. Cont. c. 11, § 9; 2 Am. & Eng. Enc. Law, 878, and note; Peoria, etc., Ry. Co. v. United States Rolling Stock Co. (Ill. Sup.) 27 N. E. 59. This rule applies to carriage by water. Carv. Carr. by Sea, § 472. As defined in Kohn v. Packard, 3 La. 224, the contract of affreightment by water is one "to carry from port to port, and the owners of a vessel fulfill the duties imposed on them by delivering the merchandise at the usual places of discharge." I can find no ground for excepting the contract in this case from that rule, and the conclusion follows that the respondent can only be charged with the liabality which attaches to the contract of storage,—that of warehouseman. The measure of that duty is the exercise of ordinary care, or the care which a reasonably prudent man takes of his own property similarly situated. If it be assumed that the storage is so connected with the transportation that the admiralty may take jurisdiction and consider that liability, and if it be further assumed that the vessel owner owed a duty of personal attention and care, aside from furnishing a competent ship keeper, the testimony does not satisfy me that there was neglect or want of ordinary care upon his part. Arguing from the result, it is easy to suggest what precautions might have saved the injury, but he was not an insurer, nor is he held to the exercise of all possible care.

2. If any cause of action is shown, I think it is not within the cognizance of admiralty. With the termination of the carriage the water-borne character of the contract ceased, and the vessel was converted into a mere winter storehouse for the corn. It is true that the ordinary contract of affreightment includes, and is only discharged by, delivery to the consignee, but here there was a constructive delivery, so far as concerned that contract, and thenceforward the corn was taken and held under the new bailment, that of warehouseman. Jurisdiction of that liability does not pertain to the admiralty. In The Pulaski, 33 Fed. 383, Mr. Justice Brown, then district judge, so held in respect to a similar contract, wherein the winter storage was at the port of shipment, intending transportation on the opening of navigation, and the libel was filed for injury suffered by the grain during the term of storage. The storage here in question was no more an incident of the transportation than it was there. The division of the contract into its separate characters is here marked by the constructive delivery at Buffalo. The storage side of the contract was not maritime. See The Hendrick Hudson, 3 Ben. 419, Fed. Cas. No. 6,355; Gilbert Hubbard & Co. v.

Roach, 2 Fed. 393; The W. F. Brown, 46 Fed. 290; The Sirius, 65 Fed. 226.

3. If the contract be regarded as maritime—as that of a carrier throughout the storage—it is doubtful whether the vessel and the owner would not be relieved of liability by the provisions of section 3 of chapter 105, Laws 1893, known as the "Harter Act." It is alleged and shown that the vessel was "in all respects seaworthy and properly manned, equipped and supplied" when the cargo was received, and if there was any fault during the winter it was "in the management of said vessel." That act expressly saves the vessel and owner from liability in such cases. See The Viola, 59 Fed. 634; The Berkshire, Id. 1007; The Silvia, 64 Fed. 607; The Etona, Id. 880; The Sintram, Id. 884.

The libel must be dismissed, with costs, and decree will be entered accordingly.