## THE SHREWSBURY.

### ELEY et al. v. THE SHREWSBURY.

(District Court, N. D. Ohio, W. D.   July 12, 1895.)

1. MARITIME LIENS—SUPPLIES AND MATERIALS—HOME AND FOREIGN PORTS.

Persons having the entire possession of a vessel, under a contract of purchase, and using her for the transportation of merchandise and passengers, are to be regarded as her owners, so that the port of their residence will be her home port, notwithstanding that, by the contract of sale, title was not to pass until full payment of the purchase money, and that the vessel was still enrolled at the port of the sellers.

2. SAME—HIRING OF VESSEL—STATE STATUTES.

Where a vessel is hired to take the place temporarily of another vessel engaged in performing regular trips, there arises against the latter vessel a lien for the contract price, under a state statute giving a lien for claims arising out of "any contract for the transportation of goods or persons." Rev. St. Ohio, § 5880.

3. SAME—CLAIM FOR WHARFAGE.

Wharfage being expressly made a lien by the Ohio statute, and being strictly a maritime lien, the same may arise in favor of a part owner of a vessel, and may be enforced in the hands of his assignees.

4. SAME—SUPPLIES.

Supplies furnished, not directly for the use of the crew and passengers, but to the persons having a lunch counter and bar upon the boat, give rise to no lien under the provision of the Ohio statute which relates to "provisions and articles of food supplied for the use of the crew and passengers, to be consumed in the use and navigation of the boat." Rev. St. Ohio, § 5880.

5. SAME—CARRIAGE FOR ANOTHER VESSEL—IMPLIED CONTRACT.

Where a vessel carries passengers under tickets issued by another vessel, according to an arrangement fixing a tariff therefor, a lien arises, under the Ohio statute, against the latter vessel, for the tariff price.

These were libels filed by John M. Eley and others against the steamer Shrewsbury to enforce alleged liens for supplies, and for claims arising out of certain contracts.

R. R. Kinkade, for libelant Eley.

R. M. McKee, for Woodruff & Anderson.

I. N. Huntsberger, for Toledo Foundry & Mach. Co., Henry P. Tobey, Edward G. Ashley, Vulcan Iron Works, M. I. Wilcox Cordage & Supply Co., Stollberg & Parks, Vrooman, Anderson & Bateman, Catawba Island Dock Co., J. N. Dewey & Co., and R. Brand Co.

A. W. Eckert, for W. F. Brenzinger.

F. N. Sala, for C. Tallmadge & Co.

F. W. Rickenbaugh, for La Salle & Koch, Breyman Bros., Wm. W. Wales, Nathaniel A. Haughton, and Christian Umbehaum & Son.

Goulder & Holding, for Cleveland & Buffalo Transit Co., Victor Manuf'g Co., F. O. Little Electrical Construction & Supply Co., Charles P. Walsh, and John O'Day.

Beard & Beard, for Maumee Baking Co.

Andrew Farquharson, for Kirschner Bros.

Moses G. Bloch, for G. W. Fonner.

RICKS, District Judge. This case is a proceeding in admiralty, and now comes before the court upon exceptions to the report of Special Master George A. Bassett, who has, in accordance with an order of reference heretofore made, filed his report as to the several claims and liens asserted against the steamer Shrewsbury, as set forth in his report and the testimony accompanying it. The briefs of counsel give evidence of great industry and ability in examining the authorities which they seem to think are controlling, in this case, and I have read them very carefully, with great profit, and have been very much aided by them in reaching the conclusion in this case.

There are a few general principles which must control us in this case, and they may as well be stated at the outset of this opinion. The following statement of facts, briefly expressed by the master in his report, is necessary for the proper application of these principles of law:

"On or about the 8th day of June, 1893, Charles Hubbard and Sherman Canfield, residents of Toledo, Ohio, entered into a written contract with the Buffalo & Niagara River Navigation Company, a corporation organized under the laws of the state of New York, with its principal place of business at Niagara Falls, in said state, whereby the said Hubbard & Canfield agreed to purchase the steamer Shrewsbury of said navigation company for the gross sum of $45,000, the terms of which contract more fully appear as Exhibit G, hereto annexed. That in pursuance of said contract, and on their making a down payment of $2,500, said Hubbard & Canfield were to have said vessel delivered to them in good order, with all her equipments, and such other parts as belonged to said steamer, etc. * * * That on or about the 10th day of June, 1893, said navigation company did deliver said steamer to Hubbard & Canfield, and thereafter the master and crew employed by said Hubbard & Canfield proceeded from Buffalo with said steamer, with the intention of taking her to the city of Toledo, in the state of Ohio, where she duly arrived on the 13th of June, 1893."

The master then proceeds to state that from and after that day she plied regularly between the ports of Toledo and Put-in Bay, until she was seized under the process of this court.

Proctors for the claimants contend that said contract for the sale of said steamer provided that the title thereof should remain in the vendors until certain conditions were complied with; that said conditions never, in fact, were complied with; and that, therefore, the title to the steamer never passed from the vendor. If this proposition be true, both in fact and in law, then the owners of said boat were residents of the state of New York, and the said boat was a foreign, not a domestic, craft when running between the ports of Toledo and Put-in Bay. The liens for supplies and material furnished her were therefore not delivered at her home port, and therefore became maritime liens whenever they were necessary, and furnished at the solicitation of the master. But I prefer to accept the conclusion of the master, that the parties who had possession of this boat during the time she carried on the business of transportation of merchandise and passengers between Toledo and Put-in Bay were entitled to the custody of the boat, and to operate the same, and that they were residents of the state of Ohio, and that, therefore, she was a domestic vessel, and that the liens now claimed against the same

were made such liens by virtue of section 5880 of the Revised Statutes of Ohio, which reads as follows:

"Any steamboat or other water craft navigating the waters within or bordering upon this state shall be liable, and such liability shall be a lien thereon, for all debts contracted on account thereof by the master, owner, steward, consignee or other agent, for materials, supplies or labor in the building, repairing, furnishing or equipping of the same, or for insurance, or due for wharfage, and also for damages arising out of any contract for transportation of goods or persons, or for injuries done to persons or property by such craft, or for any damage or injury done by the captain, mate, or other officer thereof, or by any person under the order or sanction of either of them, to any person who is a passenger or hand on such steamboat or other water craft, at the time of the infliction of such damage or injury."

The scope and effect of this statute, and the rights conferred upon parties who have furnished materials or supplies by reason thereof, are very clearly set forth by Mr. Justice Gray in the case of The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498. In that opinion, speaking for the supreme court, he says:

"Whenever the statute of a state gives a lien, to be enforced by process in rem, against the vessel, for repairs or supplies in her home port, this lien, being similar to the lien arising in a foreign port under the general law, is in the nature of a maritime lien, and therefore may be enforced in admiralty in the courts of the United States."

After reviewing and discussing the question at great length, the learned justice, speaking for the court, says:

"According to the great preponderance of American authority, therefore, as well as upon settled principles, the lien created by the statute of a state, for repairs or supplies furnished to a vessel in her home port, has the like precedence over a prior mortgage that is accorded to a lien for repairs or supplies in a foreign port under the general maritime law, as recognized and adopted in the United States. Each rests upon the furnishing of supplies to the ship, on the credit of the ship herself, to preserve her existence and secure her usefulness, for the benefit of all having any title or interest in her. Each creates a jus in re,—a right of property in the vessel, existing independently of possession, and arising as soon as the contract is made, and before the institution of judicial proceedings to enforce it. The contract in each case is maritime, and the lien which the law gives to secure it is maritime in its nature, and is enforced in admiralty by reason of its maritime nature only."

It therefore becomes only necessary to examine the master's report for the purpose of ascertaining whether he has properly classified the several claims filed, and correctly decided whether or not they were liens within the law.

Under the head of a "General Finding," on page 8 of the master's report, is a list of libelants entitled to and having a lien against the steamer, and the amounts set opposite their respective names, which list the court finds to be correct. Following the said list of libelants is another list of libels for materials and repairs furnished to and made upon the steamer, while lying at the port of Buffalo, and which he finds to be liens upon the vessel under the New York and Ohio statutes, and the same are approved by the court.

The libel of J. N. Dewey & Co. is taken by the master and considered separately, and he finds that the same is a lien under the Ohio statute, being a claim for damages arising out of "any contract for

the transportation of goods or persons." In this finding the master seems to be sustained by a construction of the water-craft law made by the supreme court of Ohio in the case of The Monarch v. Marine Railway & Dry-Dock Co., reported in 7 Ohio St. 478. This is a construction of an Ohio statute by the highest court of the state, and is persuasive in this case. The steamer Douglass was hired to take the place of the Shrewsbury while disabled. Without the aid of the Douglass, or some other boat, the Shrewsbury would have been unable to perform her trips, and such disability might have made the boat liable to serious claims for damage. The claim seems to be a very just one, is sustained by the Ohio statute as before stated, and is allowed.

The court approves the master's finding upon the libel of William W. Wales.

The master reports against the libel of Woodruff & Anderson, who claim as assignees of Sherman Canfield on a claim for wharfage. He reasons that Canfield himself, being a part owner of this boat, could not have asserted this claim against the boat, and that his assignees stand in no better position, or have no better legal rights than the assignor has, and that, therefore, their libel cannot be sustained. In this I think the master has reached a wrong conclusion. The claim for wharfage is especially named in the Ohio statute as one for which a lien is given upon the vessel. Wharfage is strictly a maritime lien. It might be preferred against the boat without reference to the relation of the libelant to the owners of the boat. It is a lien good in the hands of whoever holds it, for the amount justly due, and could be enforced against the vessel itself, without reference to the ownership thereof. It is urged by the proctor for the claimants that this claim for wharfage could not have been made on the credit of the boat, because Canfield was in fact the lessor of the dock, and knew the character of the title he had to the boat, and the relations he sustained to the claimants. This would all be true if the claim was not strictly a maritime claim. A lien for wharfage is made, under the general maritime law, a lien next in rank to wages. It is a necessary privilege for the steamer to have in order to carry on its business, and, being made a lien by the Ohio statute, I think it is enforceable without reference to the relation which Canfield holds to the claimants. I think, in this case, therefore, the libel of Woodruff & Anderson must be allowed, and the finding of the master upon this libel is overruled and set aside.

As to the libels of the Maumee Valley Baking Company, the R. Brand Company, Nathaniel A. Haughton, Chris Umbehaum & Son, Kirschner Bros., and G. W. Fonner, the master's findings are approved and confirmed. My first impression in reference to these claims was that the Ohio statute covered claims only for supplies used in the building, repairing, furnishing, and equipping of the boat. The statute, as published and punctuated in the Revised Statutes, would seem to bear this construction, but I find that the statute is construed by the supreme court of Ohio, in the case of The Huron v. Simmons, 11 Ohio, 460. In that opinion the statute is quoted as published in Swan's St. 1841, p. 209; the punctuation is different,

and, as therein published, fully supports the construction put upon it by the supreme court of Ohio, which is, that the statute was made for the protection of those who furnished "provisions and articles of food supplied for the use of the crew and passengers, to be consumed in the use and navigation of the boat." The opinion refers to the difficulty of collecting such claims against boats on the canals, and that the clear intention of the statute was to give a lien against the boat itself for such merchandise. But, impliedly, the supplies so referred to were to be of a character suitable for the use of the crew and passengers in the navigation of the boat. These supplies, it seems from the evidence before the master, were not in fact furnished the boat for the use of the crew, but were furnished to the persons who had the lunch counter and the bar, and furnished passengers liquors and refreshments. I do not think such supplies were contemplated by the legislature of Ohio as entitled to the protection of a lien upon the boat.

In his "General Finding," the master has sustained the libel of the Cleveland & Buffalo Transit Company for the sum claimed. The proctors for claimant contend that this is not right, and that there is no lien, either maritime or statutory, for this sum. They contend that there was no contract between the Shrewsbury and the Cleveland & Buffalo Transit Company by which it agreed to transport passengers for a stipulated sum, for which it should have a lien upon the boat. Mr. Norman, in his testimony, which I have read, admits that there was no written contract between the Shrewsbury and his company, but he says there was a tariff agreed upon, and describes the system under which the tickets were issued. Whenever a passenger rode upon the libelant's boats, and produced a ticket issued by the Shrewsbury, an implied contract certainly arose between the Shrewsbury and the libelant that the former would pay the latter the tariff price agreed upon for such passage. The libelant earned the passage money, and the Shrewsbury received the pay for the same. I think, therefore, a lien ought to be given the libelant for the passage money so earned. I think such a lien is covered by the Ohio statute.

In passing upon all these claims, I have felt that a very strong equity exists to hold every claim valid, possible under the law. The vendors sold this boat, received some $22,000 upon the purchase money, and within a year have received the boat back again, for failure of the vendees to comply with their contract. Under these circumstances, the court ought to sustain the claims of all libelants, where any principle of law can be found to justify it. The master's report in this case has discussed the principles involved in a very intelligent and logical manner. Both in the preparing of the report, and the arrangement of the evidence, the master has been of material service and aid to the court. The report is confirmed, except as herein expressly stated.