### THE C. VANDERBILT.
### THE NIAGARA.
### THE AMERICA.
### THE SYRACUSE.
### THE BELLE.

#### ROBINSON et al. v. THE C. VANDERBILT.

(District Court, E. D. New York. April 12, 1898.)

MARITIME LIENS—WHARFAGE—VESSEL USED FOR STORAGE.
> Although a maritime lien may attach to a domestic vessel for wharfage furnished in the ordinary course of navigation, yet no such lien arises where the vessel has been withdrawn from navigation, and is kept at the wharf for the mere purpose of storage.

Asa F. Smith (Frank D. Sturges, of counsel), for libelants.
George M. Van Hoesen (R. D. Benedict, of counsel), for claimants.

THOMAS, District Judge. The boats of the Schuyler Steam Towboat Company, operating between New York and Albany, since 1880, during the closed season of navigation, had laid up at the docks of Jeremiah P. Robinson, at the foot of Court street, in Brooklyn. Mr. Robinson died in August, 1886, and Jeremiah P. Robinson, his son, and others, his executors, appear as libelants, to enforce alleged liens for wharfage, as hereafter stated. The claimant, the Holland Trust Company, is the trustee of a mortgage dated December 24, 1890, and duly recorded December 26, 1890, covering the boats in question, and given to secure certain bonds held by the trust company and others.

The liens for wharfage are claimed against the following specified boats, for the following specified times:

```
Vanderbilt, from 28th Nov., 1890, to June 9, 1891, 191 days.
    "        "   27th July, 1891, to July 29, 1891,    3   "
Syracuse,    "   1st Dec., 1890, to March 28, 1891, 118   "
    "        "   29th July, 1891, to July 31, 1891,    3   "
Belle, March 31, April 1-9, and July 31, 1891,       11   "
America, from 3d Dec., 1890, to May 20, 1891,       169   "
Niagara,     "   27th March, 1891, to 31st July, 1891, 127 "
```

The boats occupied berths as follows:

| Vanderbilt, | No. 1, | inside, | Nov. 28th to June 9th. |
|---|---|---|---|
| " | " " | " | July 27th to July 29th. |
| America, | No. 2, | " | Dec. 3d to May 20th. |
| Syracuse, | No. 3, | " | Dec. 1st to March 28th. |
| " | No. 1, | " | July 29th, 30th, and 31st. |
| Niagara, | No. 3, | " | March 27th to 30th. |
| " | No. 1, | outside, | March 30th, to June 9th. |
| " | No. 2, | " | June 9th to July 31st. |
| Belle, | No. 3, | inside, | March 31st to April 9th. |
| " | No. 1, | " | July 31st. |

Although the boats had for several years laid up at these docks, and the libelants presumptively had the books and records of the owners thereof relating thereto, they produced no evidence, verbal or written, of the transactions between the parties previous to the season of 1890–91, nor any evidence, save as hereinafter mentioned, of the arrangement for the season of 1890–91. The libelants, however, did prove the following: That on November 28, 1890, the Schuyler Towboat Company, being unable to pay wharfage for the boats America, Syracuse, Vanderbilt, Niagara, and Belle, for a time previous to such date, but when does not clearly appear, gave notes for such indebtedness, and that at least one of such notes was renewed in whole or part on or about May 20, 1891, and that coincident with such renewal the following paper was executed:

"This note is given in renewal of a previous note for $1,409.00, dated Nov. 28th, 1890, which was given for wharfage of the steamboats America, Syracuse, Vanderbilt, Niagara, and Belle, said wharfage constituting a lien upon said steamboats.

"Albany, May 20th, 1891.      Schuyler Steam Towboat Company,
                                    "Samuel Schuyler, President."

The libelant Jeremiah P. Robinson testifies that Mr. Vosburgh, representing the Schuyler Company, when the note of November 28, 1890, was given, agreed that he would give the libelants a writing stipulating that they should not lose the lien for legal wharfage after having taken the note, or from taking the notes; that such agreement was reduced to writing, and was similar to that of May 20, 1891. On rebuttal, the same witness testified that, in connection with the giving of the notes for previous wharfage, one of which is mentioned above—

"Mr. Vosburgh asked us to take notes for the wharfage due. I declined to do it. He urged that we should take notes, as they were unable to pay cash, and he said we had our legal lien for wharfage on the boats, double wharfage for that matter, if the notes were not paid; and I told him that I would take the notes on that condition, that we should not lose our lien for wharfage according to law, which would be double wharfage, if it was not paid on demand."

The witness also stated that Mr. Vosburgh wrote a letter to that effect. These notes so given and the collateral agreements or statements have no direct relation to the wharfage in question, and are useful, if at all, to give some glimpse of the understanding of the parties as to a lien for previous wharfage. Certain evidence, however, was given, which has a direct relation to the wharfage in suit. In May, 1891, the Schuyler Company gave the following note and accompanying paper:

"$2,261.35                                    Albany, May 15th, 1891.

"Four months after date, we promise to pay to the order of Mr. Samuel Schuyler twenty-two hundred and sixty $^{35}/_{100}$ dollars at the First National Bank, New York City. Value received.

"Due Sept. 18th.                    Schuyler Steam Towboat Company,
                                               "Samuel Schuyler, Treasurer."

"The accompanying note is given for wharfage of the steamers America, Niagara. Syracuse, and Vanderbilt, for the months of December, 1890, January, February, March, and April, 1891, and interest as per annexed memorandum, said wharfage constituting a lien upon said boats.

"Albany, May 20th, 1891.              Schuyler Steam Towboat Company,
                                               "Samuel Schuyler, President."

The further evidence proffered by the libelants, bearing on the arrangement, is that of Egan, libelants' clerk, who stated that he kept a record of the wharfage of the boats, and rendered bills therefor. He stated that he understood that the Schuyler Company were to pay $5 for each berth occupied. His book containing the account of the wharfage of these boats shows that, contrary to his custom in respect to other boats, he made no entry of tonnage, no entry of the charge for the wharfage (save for the first month, which he erased under direction), and that he apparently rendered one bill for each berth, however many boats were stored in it.

The evidence of the claimants relating to the arrangement for this wharfage is given by one witness, Mr. Vosburgh, agent of the Schuyler Company, who testified:

"Q. State under what arrangement those boats went to that wharf in 1890. A. They went there. They paid $5 a day for each boat lying next to the wharf; nothing for any outside boats lying outside of the boats lying next to the wharf."

Vosburgh states that no charge was ever made for any boat save the one lying abreast the wharf; that this arrangement was made with Jeremiah P. Robinson after the death of his father, and was renewed every year. The only negative that Mr. Robinson gives to this evidence is this:

"Q. At that time (November, 1890) was any agreement made between you and Mr. Vosburgh with regard to the wharfage being five dollars a day for the future wharfage of the inside boats? A. There was not."

Such is the evidence of the parties as to a lien and to compensation. The disposition intended to be made of the suits does not require more precise finding of the facts than is indicated in the foregoing summary. Under the facts above presented, the libelants' claim for the wharfage furnished liens upon the boats, purely maritime, unaided by the local statute. This involves the inquiry (1) whether wharfage furnished to domestic vessels is a maritime service; (2) whether it entails a lien upon domestic vessels; (3) whether wharfage for the purpose of storing vessels in the winter time, or when out of commission, is maritime in its nature, and whether a lien therefor results.

The following authority holds that wharfage furnished to a domestic vessel is not maritime in its nature: Delaware River Storage Co. v. The Thomas (Cir. Ct. E. D. Pa.) 7 Fed. Cas. 413. The following authorities hold, directly or by implication, that wharfage furnished

to a domestic vessel is maritime in its nature: Ex parte Easton, 95 U. S. 68; The Virginia Rulon, 13 Blatchf. 519, 520, Fed. Cas. No. 16,- 974; The Shrewsbury, 69 Fed. 1017 (hence the lien authorized by local statute attached); The Atlantic Dock Co. v. Wenberg, 9 Ben. 464, Fed. Cas. No. 622; Town of Pelham v. The B. F. Woolsey, 16 Fed. 418; The Mary K. Campbell, 24 Blatchf. 475, 476, 31 Fed. 840; The Geo. E. Berry, 25 Fed. 780. The following cases hold that a maritime lien upon a domestic vessel attaches on account of wharfage furnished it: The Advance (Dist. Ct. S. D. N. Y., 1894) 60 Fed. 766; Woodruff v. One Covered Scow, 30 Fed. 269; The Kate Tremaine, 5 Ben. 60, Fed. Cas. No. 7,622; The Alliance, 56 Fed. 609. The following cases hold that a maritime lien upon a domestic vessel does not attach on account of wharfage furnished it: Russell v. Swift, 1 Newberry, 553, Fed. Cas. No. 12,144; Ex parte Lewis, 2 Gall. 483, Fed. Cas. No. 8,310. The supreme court of the United States has held that wharfage furnished a foreign vessel entails a lien (Ex parte Easton, 95 U. S. 68); but in that case the court did not decide that a lien for wharfage exists, by the maritime law, against a domestic vessel. The John M. Welch, 18 Blatchf. 54, 62, 63, 2 Fed. 364. The opinion of the supreme court in Ex parte Easton carefully confines the right of lien to the case of wharfage furnished to a foreign ship, although the discussion in the opinion of the maritime nature of the service is general.

It will be observed that while it may be accepted safely that wharfage furnished to a domestic vessel, in the ordinary course of navigation, is maritime in its nature, and while the authorities allow a maritime lien therefor, yet that there are two reasons for hesitating respecting the attitude of the appellate court when the question shall come before them: (1) The careful exclusion of domestic vessels from the benefit of a lien, in the opinion in Ex parte Easton, supra; (2) the analogy of the question to that involved in The Lottowanna, 21 Wall. 558, where supplies to a domestic vessel were held to be maritime in nature, but not entitled to lien therefor. However, the decisions of Judge Brown in The Allianca, 56 Fed. 609, and The Advance, 60 Fed. 766, and of Judge Benedict in The Kate Tremaine, 5 Ben. 60, Fed. Cas. No. 7,622, and Woodruff v. One Covered Scow, 30 Fed. 269, while their authority remains unimpaired, should determine the holding of the district courts of the Southern and Eastern districts of New York. But the rule thus established is not applicable to the wharfage furnished the boats here libeled, while withdrawn from navigation. A service furnished under such conditions is not within the fundamental reasons that have prompted the courts to award liens for wharfage, or for any other purpose. At the outstart, it should be noticed that, although wharfage afforded for storage to domestic ships removed from navigation be maritime in its nature, it does not follow that a maritime lien results. The implied contract for supplies and materials furnished to domestic vessels is maritime in nature, and yet entitled to no lien. The Lottowanna, 21 Wall. 558. Nor is the question primarily determined by the fact that the service is, or is not, afforded on the credit of the ship. It is necessary to the existence of all maritime liens that the credit should be given to the ship, but the mere presence of such

fact would not of itself characterize the service as maritime. Much less would it establish the existence of a lien. In The Lottowanna, 20 Wall. 201, 21 Wall. 558, supplies were furnished to a domestic vessel on the credit of the vessel, but a lien therefor was not recognized. There is beyond this a necessary element to the existence of a lien, and that element pervades all contracts for which liens are given.

Whatever is done to operate a ship, to aid her physically in the performance of her mission, viz. to take freight or passengers, to carry freight or passengers, to unload freight or passengers, and to preserve her while so doing, is a maritime service; and if the service be rendered to the ship, and on the faith of the ship, a lien therefor usually arises. The case of supplies and materials furnished a domestic vessel, on the credit thereof, is an exception, and, as has been claimed, an illogical exception. See opinion of Clifford, J., in The Lottawanna, 20 Wall. 201, and dissenting opinion of the same judge in The Lottawanna, 21 Wall. 558, and The Kate Tremaine, 5 Ben. 60, Fed. Cas. No. 7,622. But it may be safely stated that no service, although maritime in its nature, entails a lien unless it be done in course of the preparation of the ship for her voyage, or the operation of the ship on the voyage, and to the conclusion of the voyage, which includes the unloading of the ship. If now wharfage be considered, it may be said to be essentially maritime, and to be entitled to a maritime lien, so long as it is connected with the fitting of the ship for, or the operation of the ship to the completion of the voyage. The wharf is a necessary instrumentality to the fulfillment of the ship's duty, viz. the reception and discharge of cargo and freight, the making ready of the ship for the voyage, and the restoration of the ship after one voyage preparatory to another. But if an empty ship be tied to a wharf, because her field of operation is closed by ice, or because she is taken away from navigation, the case is widely different. She is at the wharf for no purpose of navigation, but for the precise purpose of nonnavigation, and because navigation is not contemplated. She is not at the dock for passengers, for freight, for repairs, or any purpose preceding or succeeding the actual voyage. She is not there for rest, even in the sense of lying up for some preparation for another voyage, or reparation from a voyage ended; but the sole reason of her presence at the wharf is that she has gone out of commission, withdrawn temporarily from navigation, abandoned for the time the purpose of her construction, because the locality of her journeying positively prohibits the continuance of such occupation, or because there is no occasion or opportunity for her use. The mariners are discharged, the boat is shut up, like a closed house, and is left in idleness to a caretaker or watchman, and so remains until the owner sees fit to withdraw her from this state of suspension for her appropriate use. Such an abandonment, such a complete isolation and disconnection with navigation, as this, bears no analogy to any condition of a ship when a lien is allowed for a service rendered her. Would a watchman or caretaker be entitled to a lien for his services on a boat in such a situation? How would such watchman's services be equivalent to the services of a mariner? The services of a mariner could not be required in the

nature of the case, for the mariner is an operative, and the boat in winter quarters is a dead thing, to whom a mariner would be useless. It is difficult to conceive of any act of man in connection with a ship, or any condition of a ship, unless it be one of permanent abandonment, so divorced from navigation as this laying up of a boat at the end of a season, and at the close of navigation, until it should be wanted again, or the taking of a boat out of commission at any time for the mere purpose of storage.

Liens for wharfage have been allowed in cases where the service was rendered in connection with actual navigation, when passengers or freight were to be transported to or from the vessel, or the wharf was used for some purpose convenient or necessary to the resumption or completion of the ship's voyaging. But it will be found, upon investigation, that the principle of commercial activity on the part of a ship is always present when a lien is recognized for a service rendered her. Truly, she may be lying in apparent idleness at the dock; but she is indolent only in the sense that, in the matter of cargo or repairs or victualing or manning, she is making ready for her journey.

In The Kate Tremaine, 5 Ben. 60, Fed. Cas. No. 7,622, the lien was allowed against a boat employed in transporting freight between the cities of New York and Albany; and, in the course of such employment, she was moved to the libelant's wharf, and there discharged her cargo. Judge Benedict, in his opinion, states:

"A wharf is a necessity of modern navigation, and of navigation alone. The sole object of its erection is to facilitate the transportation of passengers and freight upon navigable waters."

In Ex parte Easton, 95 U. S. 68, it is said of a wharf:

"Erections of the kind are constructed to enable ships, vessels, and all sorts of water craft to lie in port in safety, and to facilitate their operation in loading and unloading cargo and in receiving and landing passengers. * * * Conveniences of the kind are wanted both at the port of departure and at the place of destination, and the expense paid at both are everywhere regarded as properly chargeable as expenses of the voyage. * * * Instances may doubtless be referred to where wharves are erected as sites for stores and storehouses; but the great and usual object of such erections is to advance commerce and navigation, by furnishing resting places for ships, vessels, and all kinds of water craft, and to facilitate the operation in loading and unloading cargo, and in receiving and landing passengers. * * * Repairs to a limited extent are sometimes made at the wharf; but contracts of the kind usually have respect to the voyage, and are made to secure a resting place for the vessel during the time she is being loaded or unloaded. Such contracts, beyond all doubt, are maritime, as they have respect to commerce and navigation, and are for the benefit of the ship or vessel when afloat."

In The Brooklyn, 46 Fed. 132, 133, Judge Brown does, indeed, remark that wharfage "may accrue for the use of the dock in mooring for the purpose of protection and safety only"; but after citing for this The George E. Berry, 25 Fed. 780, the learned judge adds:

"But in this port such a charge is ordinarily for the purposes of loading or unloading cargo on the dock, and that includes, necessarily, a berth for the vessel, and a place of deposit for the cargo."

In The George E. Berry, the learned judge states: "'Wharfage,' in its most general legal sense, doubtless includes the mooring of vessels

for the purpose of protection and safety, as well as for loading and unloading the cargo,"—and holds that, under the enabling statute of the state, a town could impose a charge for wharfage for mooring only by a designated private individual, even in connection with his shipyard and business, but adds: "The general ordinance passed by the town, however, must be construed to refer to vessels engaged in navigation, or in loading or unloading some parts of their contents." There is no suggestion that a maritime lien, unaided by the statute, could arise. See, also, remarks in the opinion in Town of Pelham v. The B. F. Woolsey, 16 Fed. 418, 423.

In The Allianca, 56 Fed. 609, 613, Judge Brown states that there is no true analogy between repairs or supplies and wharfage furnished to a domestic vessel. He enforces the suggestion by pointing out that contracts for repairs or supplies are usually matters of deliberate compact, made while the vessel is in port, while, on the other hand, wharfage is often a matter of immediate or pressing necessity, "either for safety, or for the completion of the ship's voyage, and for the full performance of her maritime duty," and that it is usually not a matter of bargaining or of direct order. Such a statement, obviously, could not be applicable to the conditions attending the wharfage in the case at bar.

In The Advance, 60 Fed. 766, the same learned judge states:

"Ever since the decision of Benedict, J., in the case of The Kate Tremaine (1871) 5 Ben. 60, Fed. Cas. No. 7,622, it has been the law and practice in this district to recognize a maritime lien for wharfage furnished to domestic vessels when the wharfage is obtained in the ordinary course of navigation, on the engagement of the master or officers of the ship. See, also, The Allianca, 56 Fed. 609, 613. In all cases, however, to sustain a maritime lien, there must be either in fact, or by presumption of law, a credit of the ship; and, whenever such credit is negatived by the evidence, no such lien, whether maritime or statutory, will be recognized. The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 396, 403."

In a few sentences is here embodied the spirit of the law on the question of maritime liens for wharfage.

In The Shrewsbury, 69 Fed. 1017, 1020, the opinion suggests the principle:

"A lien for wharfage is made, under the general maritime law, a lien next in rank to wages. It is a necessary privilege for the steamer to have in order to carry on its business."

In Woodruff v. One Covered Scow, 30 Fed. 269, it appeared that a scow had been for a long time moored at the libelant's dock, and a lien for wharfage thereon was allowed. As the holding, unexplained, might seem to diminish the uniformity of the judicial utterances on this subject, a portion of the opinion may be given:

"The case in this aspect would be easily disposed of if the structure in question could be held to be a ship or vessel; the supreme court having, in Ex parte Easton, 95 U. S. 68, held a contract for the wharfage of a ship or vessel to be maritime. But this structure, being stationary, and never employed in the transportation of freight or passengers, from place to place upon the water, cannot be held to be a ship or vessel. The case, therefore, is not covered by Ex parte Easton. Neither in Ex parte Easton, nor in any other case to which

I have been referred, has the precise question here involved been determined. Nevertheless, the grounds upon which the decision in Ex parte Easton proceeds afford reason, in my opinion, to hold the present contract to be maritime in character; for it will be observed that the subject-matter is the same in the one case as in the other, save only in this: that the structure accommodated is not engaged in the transportation of passengers or freight from place to place upon the water. What the wharfinger furnishes, under contract with a ship or vessel, the libelant furnished to this structure, namely, a resting place, safe from the influence of currents and of tides, and this he did by means of a wharf, which is an incident to navigation. Moreover, the object of this resting place was to facilitate the landing of sails, oars, and persons from the small boats accustomed to use this structure, and engaged in navigation. The object sought to be secured by the contract with the libelant for the use of his wharf for this float was similar in character to the object sought to be secured by a contract for the wharfage of a ship. Furthermore, the structure itself, although not a ship or vessel in the legal sense, and perhaps not one of the other 'kind of water craft' to which the supreme court, in Ex parte Easton, alludes as distinct from a ship or vessel, is used in connection with navigation on the water and the transportation on the water of passengers and freight, and in no other occupation. If no boats had frequented this slip for the purpose of landing persons or goods, this float would not have been there. It was there because the boats coming there required it, in connection with the navigation in which they were engaged. The use to which the float was put seems clearly maritime in character. The necessities which made a wharf necessary for the float were necessities of the sea, while the benefit derived from the use of the wharf by this structure inured to persons and things transported on the sea. These considerations appear to me to be sufficient to authorize a determination that a contract for the wharfage of such a structure is a maritime contract, by reason of the subject-matter. The contract sued on being maritime, the jurisdiction of the admiralty to enforce it follows of course. There remains the question whether the maritime law attaches to such a contract a lien for the wharfage. Upon this question there is little room to doubt. By the maritime law a lien for wharfage always attaches to a ship or vessel, and the reasons for the lien in the case of a structure like this are as forcible as in the case of a ship."

It may be judged, from the reasons given for the decision, to what extent it should be influential in the disposition of the question at bar. Whatever dissent may exist to the conclusion, it will be observed that the decision is based upon the connection of the scow with active maritime commerce.

The foregoing characterizations of the nature of wharfage and its relation to maritime enterprises sufficiently indicate that ships retired from service are not subject to maritime lien. Happily the question is not without direct authority. The mere fact that an empty, unmanned ship is tied to a wharf does not of itself create a lien against it for wharfage. In The Mary K. Campbell, 24 Blatchf. 475, 31 Fed. 840, Judge Wallace decided that a wharfinger acquired no privileged lien against a vessel seized by a sheriff under an attachment, and taken to and kept at the wharf at the instance of that officer. And yet the sheriff had a special property in the vessel, which authorized him to take possession of her, to move her to such place as he saw fit, to engage wharfage for storing her pending sale; but the essential feature of her condition was that she was withdrawn from maritime service, and her changed relation modified the rights of the persons affording her wharfage.

In The Murphy Tugs, 28 Fed. 432, the question was directly decided

by the district and circuit courts.    The following extract from the opinion embodies the decision:

"The claim of William Miller for wharfage during the winter of 1884 and 1885 must also be rejected.    It has been our practice to limit the application of the state statute giving a lien for wharfage to the season of navigation, when the use of a wharf is necessary to the employment of the vessel, but not to allow a lien for services rendered the vessel while she is laid up during the winter; such as the use of a slip, the storage of sails and rigging, or the hiring of a watchman.    These are in no sense maritime in their nature. The E. A. Barnard, 2 Fed. 712; The Island City, 1 Low. 375, Fed. Cas. No. 7,109.    The Thomas Scattergood, 1 Gilp. 1, Fed. Cas. No. 11,106.    In cases of this kind the wharfinger would probably have a common-law lien dependent upon possession, and he should not relinquish such lien until his claim is satisfied."

This holding has been cited frequently with approval in cases where contracts for the storage of grain in vessels during the winter, either at the point of shipment or delivery, have been held not to be of a maritime nature.    Such contracts have been likened to the winter storage of vessels.    The Pulaski, 33 Fed. 383, 384, where it is said:

"To be the subject of an admiralty lien for a breach of contract, the vessel must be, at the time, engaged in commerce and navigation, or in preparation therefor (The Hendrick Hudson, 3 Ben. 419, Fed. Cas. No. 6,355); and the service must be maritime in its nature (A Raft of Cypress Logs, 1 Flip. 543, Fed. Cas. No. 11,527;  Gurney v. Crockett, Abb. Adm. 490, Fed. Cas. No. 5,874; The John T. Moore, 3 Woods, 68, Fed. Cas. No. 7,430).    This case is really of the same nature as a claim for winter wharfage, passed upon in this court, and affirmed by the circuit court, in The Murphy Tugs, 28 Fed. 429."

To the same effect are The Richard Winslow, 67 Fed. 259, affirmed by the circuit court (7th Cir.) 18 C. C. A. 344, 71 Fed. 426, wherein it was said:

"A maritime contract must therefore concern transportation by sea.    It must relate to navigation and to maritime employment.    It must be one of navigation and commerce on navigable waters.    Unquestionably, there was here a contract for carriage by sea, and that contract was maritime in its nature.    But there was joined with it a contract with respect to the cargo after the completion of the voyage that was in no respect maritime in its nature.    If, as judge (now Mr. Justice) Brown observes in The Pulaski, 33 Fed. 383, the storage were a mere incident to the transportation, the entire contract would be held to be maritime, and within the admiralty jurisdiction.    But here the contract for holding the corn in storage did not concern navigation.    It could not take effect until after completion of the voyage, and had no relation to further transportation of the cargo of the vessel.    It was to be performed at a time when the vessel was not engaged in commerce or navigation, or in preparation therefor.    It was merely a contract for winter storage, and was no more maritime in its nature than the nonmaritime contracts for winter wharfage (The Murphy Tugs, 28 Fed. 429); for the employment of a dismantled hull (The Hendrick Hudson, 3 Ben. 419, Fed. Cas. No. 6,355); for the storage of a vessel's outfit during winter (Hubbard v. Roach, 2 Fed. 393); or for the service of a shipkeeper during winter (The Sirius, 65 Fed. 226).    The reason is that such service does not pertain to the navigation of a ship, nor assist a vessel in the discharge of a maritime obligation."

See The Pulaski and The Murphy Tugs, cited for authority in Steamship Co. v. Ferguson, 22 C. C. A. 671, 76 Fed. 993.

Liens for personal services:    If the examination of the general principle here presented be extended, it will be found to be the vital test of the existence of liens for personal services.    The service must be connected with a ship voyaging, or making ready to voyage, or com-

pleting a voyage. The nearer the service is to the very act of voyaging, the higher ranks the lien. Hence the preference for mariners' wages. In just the degree that the service recedes from the activities of the going and coming of the ship, or the immediate preparation for such going or coming, the right of lien for such service becomes doubtful, or the lien, if existing, diminishes in rank. Hence the long doubt as to the standing of the services of stevedores, and the final settlement of the question favorably to their lien. In such cases the arguments have been directed to assimilating their service to that of mariners, or to uniting them to the vessel, while yet in the course of transportation, actual or constructive. The same principle pervades the discussion of the rights of watchmen as lienors, and it will be sufficient to direct attention to two late and instructive decisions, The Hattie Thomas, 59 Fed. 297, and The Sirius, 65 Fed. 226. The strong temptation to quote from them at length must be limited to two brief extracts from the opinions. In the latter case Judge Morrow said:

"It is a cardinal principle of admiralty jurisprudence that, to give a court of admiralty jurisdiction over contracts, the subject-matter thereof must be maritime. It is not enough that the service which sprang from the contractual relation be performed on water, or even that it be done on board, and for the benefit, of a vessel which is afloat. These are not the exclusive tests: The service arising from the contract must be of a maritime character, and I might add not nominally, but substantially, so. The expression 'maritime character' or 'nature' is held to mean any act which contributes to the navigation of the vessel, presently or prospectively. This is rather a broad and indefinite statement, but the needs of vessels in navigation are so complex and diverse that it is difficult to give an exhaustive, and at the same time accurate and intelligible, definition. However, Judge Betts, in Cox v. Murray, Abb. Adm. 340, Fed. Cas. No. 3,304, gives one an excellent idea of the scope of the expression as applied to contracts. He says: 'The subject-matter of the contract—the substantial object and end—must pertain to navigation, or be connected with transactions performed by vessels on the sea, to become maritime in its nature, and be clothed with the privilege of a remedy in admiralty courts; and it appears to me that an agreement acquires this maritime quality only when the matters performed or entered upon under it pertain to the fitment of a vessel for navigation, aid, and relief supplied her in preparing for and conducting a voyage, or the freighting or employment of her as an instrument of a voyage. Collateral contracts with or assistance by services, or advances to an owner or master, incidentally benefiting a voyage, acquire no special property thereby which renders them maritime.'"

In the former case Judge Townsend said:

"It seems to me that the principle deducible from the cases establishes that, where services are rendered in the home port of the vessel, the question whether there is an admiralty lien, irrespective of statute, depends largely upon whether the services are in the nature of repairs or supplies or other necessaries for the vessel, such as are furnished by material men, or are such in kind as would be rendered by a mariner. If they are of the latter character, it seems that they are of equal rank with those of other seamen, and constitute a lien against the vessel. It is further important to inquire whether the services concern the cargo or freight or the vessel itself or her maritime duties, and, if the latter, whether they are connected with her navigation, present or prospective."

These cases illustrate the ultimate considerations that justify maritime liens, and furnish tests for determining their existence.

The views above expressed lead to the conclusion that no maritime lien attached to the boats during the time that they were withdrawn

from commerce and navigation. It is therefore unnecessary to consider, as a distinct proposition, whether the wharfage was furnished on the credit of the boats. It results that the libels must be dismissed, with costs, in the cases of the America and the Niagara; but in the case of the Syracuse there was wharfage furnished for July 29th, 30th, and 31st, and in the case of the Vanderbilt from July 27 to July 29, 1891, and in the case of the Belle for March 31st, April 1st to 9th, inclusive, and July 31st. This wharfage has no connection with storage, and the usual rule obtaining in this district is applicable. Decrees therefore should be entered against the Syracuse for three days' wharfage, against the Vanderbilt for three days' wharfage, and against the Belle for eleven days' wharfage, all at the rate of $5 per day, with costs.